# 14-1554cv

### IN THE
### UNITED STATES COURT OF APPEALS
### FOR THE
### SECOND CIRCUIT

---

J. TAIKWOK YUNG (web-adviso),
Plaintiff-Appellant

v.

DONALD J. TRUMP,
Defendant-Appellee

On Appeal from the United States District Court
for Eastern District of New York

---

## BRIEF FOR PLAINTIFF-APPELLANT, WITH ADDENDUN

J. Taikwok Yung (Pro Se)

556 E88th St.
Brooklyn, NY 11236

Tel: 646.309.8421
Email: sporting202@yahoo.com

Pro Se Plaintiff-Appellant



p1

# **TABLE OF CONTENTS**

|  | Page |
|---|---|
| Table of Authorities | p3 |
| Jurisdictional Statement | p9 |
| Statement of Issues Presented for Review | p10 |
| Statement of the Case | p12 |
| Statement of Facts | 1 |
| Summary of Argument | 6 |
| Argument | 9 |
| 1. The Plaintiff-Appellant's Websites are Non-Commercial Speech | 9 |
| 2. The Plaintiff-Appellant's Website Contain Protected Consumer Commentary | 13 |
| 3. The at-issue mark's "Distinctive" or "Famous" attributes consideration | 15 |
| 4. Not Confusingly Similar | 20 |
| 5. There is no Cybersquatting | 26 |
| 6. Fair Use and First Amendment | 28 |
| 7. Laches protection | 37 |

| 8. Conclusion | 42 |
|---|---|

## APPENDIX CONTENTS

| | Page |
|---|---|
| Appendix 1: Original complaint | App.1 |
| Appendix 2: Def's Reply to complaint with counter claims | App.11 |
| Appendix 3: Opinion and Order | App.33 |
| Appendix 4: interlocutory appeal decision 13-1162cv 2nd circuit | App.58 |
| Appendix 5: Summary Order | App.59 |
| Appendix 6: The final judgment | App.62 |
| Appendix 7: Notice of Appeal for this instant appeal | App.64 |
| Appendix 8: Order to deny Motion for Reconsideration. | App.65 |

## TABLE OF AUTHORITIES

| | |
|---|---|
| ACLU of Georgia v Miller, 977 F Supp 1228, 1233 (ND Ga 1997) | 10 |
| | |
| Authors Guild, Inc. v. HathiTrust, 902 F. Supp. 2D 445, 460-61, 464 22 (S.D.N.Y. 2012) | 33 |
| | |

| | |
|---|---|
| Bally Total Fitness Holding Corp v Faber, 29 F Supp 1161, 1167 (CD Cal 1998) | 10 |
| Bose Corp. v Consumers Union, 466 U.S. 485 (1984) | 13 |
| Bosley Medical Institute, Inc. v Kremer, 403 F3d 672 (9th Cir 2005) | 10, 13, 14 |
| Career Agents Network, Inc. et v. White et al (Case No. 2:09-cv-12269: 21 Eastern District of Michigan) | 31 |
| Century 21 Real Estate Corp. v Lendingtree, 425 F.3d 211 (3d Cir. 2005) | 36 |
| Champions Golf Club v The Champions Golf Club, Inc., 78 F3d 1111, 1116 (6'h Cir 1996) | 19 |
| CPC Int'l v Sldppy, Inc., 214 F.3d 456, 562 (4'h Cir. 2000) | 13, 23 |
| Daddy's Junky Music v Big Daddy's Family Music Ctr., 109 F3d 275, 280 (6th Cir 1997) | 20 |
| Donald Trump v. O'Brien, SUPERIOR COURT OF NEW JERSEY; APPELLATE DIVISION; DOCKET NO. A-6141-08T3 | 40 |
| ETW Corp. v Jireh Publ'ing, 332 F.3d 915, 920 (6th Cir. 2003) | 35 |
| Ford Motor Company v 2600 Enterprises, 177 F Supp 2d 661 (ED Mich 2001) | 11, 22 |
| International Stamp Art v USPS, 456 F.3d 1270, 1274 (11th Cir. 2006) | 35 |

| | |
|---|---|
| KP Pennant Make-Up v Lasting Impression I, 543 U.S. 1I1 (2004) | 35 |
| Lamparello v Falwell, 420 F.3d 309, 313 (4th Cir. 2005) | 13 |
| Lighthawk v Robertson, 812 F Supp 1095, 1097-1101 (WD Wash 1993) | 10 |
| LL Bean v Drake Publishers, 811 F2d 26,32-33 (I" Cir. 1987) | 10 |
| Lucas Nursely and Landscaping, Inc. v Grosse, 359 F3d 806 (6'h Cir 2004) | 26 |
| Lucasfilm v High Frontier, 622 F Supp 931 (DDC 1985) | 9 |
| Lucent Technologies v Lucentsucks.com, 95 F Supp2d 528 (ED Va 2000) | 10 |
| Mattei v MCA Records, 28 F Supp 2d 1120, 1144-1145 (C.D. Cal. 1998) | 13 |
| Mattel,Inc. v Walking Mountain Prods., 353 F.3d 792, 810 (9th Cir. 2003) | 36 |
| Name.Space, Inc. v. Network Solutions, Inc., 202F. 3d 573, 586 (2d Cir. 2000) | 30 |
| New Kids on the Block v. News America Publ'g, 971 F.2d 302,307 (9'h Cir. 1992) | 14, 35 |
| NissanMotor Co. v Nissan Computer Corp., 378 F.3d 1002,1016-1017 (9th Cir. 2004) | 11 |

| | |
|---|---|
| Northland Ins Co v Blaylock, 115 F Supp2d 1108 (D. Minn 2000) | 22 |
| Organization for a Better Austin v Keefe, 402 U.S. 415 (1971) | 11 |
| People for the Ethical Treatment of Animals v Doughney, 263 F3d 359 (4th Cir 2004) | 11 |
| Pinehurst, Inc. v. Wick, 256 F. Supp. 2d 424, 431 (M.D.N.C. 2003) | 25 |
| Planned Parenthood Fed 'n of Am., Inc. v. Bucci, 1997 WL 133313 (S .D.N .Y. Mar. 24, 1997), 920 (2d Cir. 1998) | 30 |
| Playboy v Welles, 278 F.3d 796, 803-804 (9th Cir. 2002) | 22 |
| Porous Media Corp v Pall Corp., 173 F3d 1109, 1119-1121 (8th Cir 1999) | 13 |
| Procter& Gamble Co. v Bankers Trust Co., 78 F.3d 219 (6th Cir. 1996) | 11 |
| Reno v ACLU, 521 U.S. 844 (1997) | 13 |
| Semco v Amcast, 52 F3d 108, 111-112 (6"' Cir 1995) | 9, 13 |
| SMJ Grp., Inc. v. 417 Lafayette Rest. LLC, 439 F. Supp. 2d 281, 291 (S.D.N.Y. 2006) | 32 |
| Sporty's Farm v Sportsman's Market, Inc., 202 F3d 489 (2"d Cir. 2000) | 26 |

| | |
|---|---|
| Stop the Olympic Prison v United States Olympic Comm., 489 F Supp 1112, 1124-1125 (SDNY 1980) | 10 |
| Strick Corp. v Strickland, 162 F Supp 372 (ED Pa 2001) | 20 |
| Taubman v Webfeats, 319 F3d 770, 775 (6th Cir 2003) | 12 |
| The Authors Guild et al. v. Google et al. (Case 05 Civ. 8136 22 (DC): SDNY) ] | 32 |
| TML Inc. v Maxwell, 368 F.3d 433 (5'h Cir. 2004) | 13 |
| Universal Communication Systems v Lycos, Inc. | 13, 15 |
| US Healthcare v Blue Cross of Greater Philadelphia, 898 F2d 914, 927-939 (3d Cir 1990) | 13 |
| Wells Fargo & Co. v WhenU.com, 293 F.Supp. 2d 734,754 (E.D. Mich.2003) | 20 |
| Wynn Oil Co. v Thomas, 839 F2d 1183, 1186 (6'h Cir 1988) | 20 |
| | |
| | |
| | |
| **Statutes** | |
| | |
| Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 | p8 |
| | |
| Freedom of Speech 1st Constitutional Amendment. | 1, 8, 9, 13,28, 30, 34, 38 |
| | |
| 15 U.S.C.§ 1125(c)(2)(A)(ii) | 36 |
| | |
| 15 U.S.C. 1114(1)(a) | 9 |

| | |
|---|---|
| 15 U.S.C.1125(a)(l)(B) | 9 |
| 15 U.S.C.1125(c)(4)(B) | 9 |
| 15 U.S.C.1125(d)(l)(a) | p9 |
| 15 U.S.C. § 1114(1) | p9 |
| 15 U.S.C. § 1125(a) | p9 |
| 15 U.S.C. § 1125© | p9 |
| 15 U.S.C. § 1125(d) | p9 |
| New York Common Law | p9 |
| N.Y. General Business Law § 349 | p9 |
| N.Y. General Business Law § 360-1 | p9 |
| 28 U.S.C. § 1292(a)(l) | p9 |

**Statement of Subject Matter and Appellate Jurisdiction Statement**

Plaintiff in his pro se complaint sought declaratory relief under the Anti-cybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d)(l)(a). The defendants counterclaimed seeking relief on seven (7) claims: trademark infringement (15 U.S.C. § 1114(1)), unfair competition (15 U.S.C. § 1125(a)), trademark dilution (15 U.S.C. § 1125(c)), Anti-Cybersquatting Consumer Protection Act ("ACPA"), (15 U.S.C.§ 1125(d)), unfair competition under New York Common Law, the New York Deceptive and Unfair Trade Practices Act (N.Y. General Business Law § 349), and trademark dilution under New York Law (N.Y. General Business Law § 360-l).

The defendant motioned for partial summary judgment, which the district Judge granted. The district court issued an opinion and order in favor of the defendant granting their partial summary judgment request along with an order for the adoption of the Findings and Recommendations by the magistrate Judge, awarding $32,000 and the transfer of the at-issue domain names. A final judgment was issued on March 27, 2015. From which, the plaintiff timely appealed the final decision order on April 25, 2014. This Court therefore has jurisdiction under 28 U.S.C. § 1292(a)(l).

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1. Whether plaintiff's use of the at-issue Domain Names TRUMPBEIJING.COM, TRUMPMUMBAI.COM, TRUMPINDIA.COM, TRUMPABUDHABI.COM and website, which offers no products or services and provides no links to other sites which offer products or services, and which consists only of non-commercial speech, consumer commentary and political speech, have First Amendment protection and the safe harbor protection of the ACPA against defendant-appellee's counter-claims under the ACPA.

2. Whether plaintiff-appellant's use of the at-issue Domain Names, which identify the topic discussed on the website with disclaimers and the website, which offers opinion, critical commentary and no products or services, is a fair use which requires dismissal of defendant-appellee's claims under the ACPA of the Lanham Act.

3. Whether plaintiff-appellant's registration of the Domain Names constitutes cybersquatting where there is no evidence of bad faith intent to

profit from plaintiff's use of defendant-appellee's mark when the use has always been non-commercial use.

4. Whether Laches should of been enforced where the defendant appellee, with all their stated expertise and knowledge of internet domains, failed to bring their claim for over three years and the district court's finding of not granting Laches protection because of the findings of the intent to capitalize or profit from the use of the at-issue domains and website without supporting evidence to show a commercial intent or use.

5. Whether it was arbitrary and capricious for the district court in their determination for the ACPA in favor for the defendant appellee when the at-issue domains and website use had no commercial use and no consumerism, but have consumer commentary, noncommercial speech and political speech.

6. Whether the district court error in not providing due consideration for the prongs of the ACPA by applying arbitrary and capricious standards.

## STATEMENT OF THE CASE

The plaintiff bought at-issue pro se action seeking a declaratory judgment that his non-commercial fair use of the domain names did not violate the ACPA or infringe the trademarks of the individual defendant, Donald J. Trump (Addendum ("Add.") 1). The plaintiff filed this action on March 22, 2011. On May 6, 2011, the defendant replied and counterclaimed (See Add. 2). On April 17, 2012, Defendant moved for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on plaintiff's declaratory judgment claims and Defendant's counterclaims for federal and state trademark infringement, federal and state unfair competition and violation of the ACPA. On April 28, 2013, the defendant's motion was granted by the district court judge (Irizarry, D) in an Opinion and Order (See Add. 3) with respect to their ACPA claim and denied as moot as to all other claims and dismissed the plaintiff's claims. On Feb 28, 2014, the magistrate judge (Pohorelsky, V) issued a Report and Recommendation, an opposition to that was filed by the plaintiff-appellant. The Report and Recommendation was adopted by the district court in a Summary Order on March 26, 2014 granting the financial award of $32,000 and the domain names to the defendant. On March 28, 2013, the plaintiff

timely filed for an interlocutory appeal on the district court's decision

granting the partial summary judgment (2nd circuit DOCKET 13-1162cv).

On July 17, 2013, the 2nd circuit dismissed the interlocutory appeal stating

the district court's proceedings have not concluded with a final order (See

Add. 4). The final judgment on this dispute by the district court was issued

on March 27, 2014 (See Add 6). April 25, 2014 the plaintiff timely appealed

(this instant appeal 14-1554cv) (See Add. 7). The plaintiff filed for motion

for reconsideration, which stayed this instant appeal until the motion was

denied by the district court on March 3, 2015 (See Add. 8).


    The addendum, see Rule 30.1(e)(3), contains copies of the district

court's opinions and order.

## STATEMENT OF FACTS

The plaintiff is a major award winning web/mobile developer and who is the current leader and tech development leader of the CarChildSafety project to help prevent parental mistakes as in forgetting your child in the hot temperature summer cars that has been reported in the news.

On Thursday Sept. 20, 2007, plaintiff-appellant acquired the at-issue domain names trumpbeijing.com, trumpmumbai.com, trumpindia.com and on Tues. Nov. 27, 2007, acquired trumpabudhabi.com. The at-issue domains were established as a mainly fan parody content to express legitimate free speech contents on political topics on the economy and related and also with some related news from RSS technology and opinion commentary. On Friday, Dec. 17th, 2010, the defendant-appellee filed an action with the World Intellectual Property Organization (hereinafter "WIPO") Arbitration and Mediation Center alleging that the at-issue domains was confusingly similar to its marks and that the plaintiff-appellant used the at-issue domains in bad faith. A WIPO panel ruled against plaintiff-appellant and ordered that the at-issue domains be transferred to defendant-appellee. The defendant-appellee filed their WIPO UDRP complaint after the fact the at-issue domains have been registered since late 2007, meaning the defendant-appellee delayed over 3 years since registration of the at-issue domains to bring the WIPO UDRP complaint. On the day of registration of the at-issue domains the defendant-appellee doesn't have any real estate under construction nor have established

1

offices in Abu Dhabi, UAE; Beijing, China; Mumbai nor in India. There is also no proof that the defendant-appellee's have any geopolitical claim to the entire territories of the mentioned areas.

Please let the court recognize there are numerous coexisting trademarks and generic non trademarks containing or comprised of the term "trump" such as "trumpet.com". The following words or alphabet combinations of the generic English word "trump" are used widely in domain names by numerous competing, non-commercial or non-competing companies to Donald Trump and his organizations, that includes non-profit organizations, musicians, personal blogs, ad-supported websites and etc. Likewise, please let the court also recognize there are numerous domain names consisting of the spelling "trump" with different top-level domains or word combinations, none of which any party in this dispute owns:

trumpet.com

trump-art.com

trumpcareer.com

trumpcation.com

trumpclassrooms.com

and over 17,000 more ...

May the record show the plaintiff-appellant never contacted the defendant-appellee nor any other entities or companies about the sale of the at-issue domains because the at-issue domains are NOT FOR SALE. It was the defendant-appellee's party that initially sent a legal letter to harass and threatened legal action and then filed the UDRP complaint. Both parties entered settlement talks over the phone, but no settlement agreement was reached over the course of the talks. At any time, there was no active advertisement of the at-issue domains that it was stated for sale. The non-commercial fair use of the at-issue domains' websites have no ads, no statement to offer to sell nor any mechanism to try profit from the at-issue domains or its websites, no element of commerce and consumerism is here in this case.

The plaintiff-appellant never first contacted the defendant-appellee nor any other entity/company about the sale of the at-issue domains. It was the defendant-appellee's party that contacted the plaintiff-appellant for a bogus offer to settle while using entrapment tactics to attempt to illicit some damaging wording by the plaintiff-appellant and then filed the UDRP complaint with WIPO and later filed counter-claims in this instant case with bias misleading mentioning of financial terms of sale of the at-issue domain names not proposed by the Plaintiff.

There was and still no active advertisement outside of the at-issue domains that it was stated for sale.

The plaintiff-appellant bought the at-issue pro se action seeking a declaratory

judgment that his non-commercial fair use of the domain names did not violate the

ACPA or infringe the trademarks of the individual defendant, Donald J. Trump

**(Addendum ("Add.") 1).** The plaintiff filed this action on March 22, 2011. On May 6,

2011, the defendant replied and counterclaimed **(See Add. 2).** On April 17, 2012,

defendant-appellee moved for partial summary judgment pursuant to Rule 56 of the

Federal Rules of Civil Procedure on plaintiff-appellant's declaratory judgment claims

and defendant-appellee's counterclaims for federal and state trademark infringement,

federal and state unfair competition and violation of the ACPA. On Feburary 28, 2013,

the defendant's motion was granted by the district court judge (Irizarry, D) in an

Opinion and Order **(See Add. 3)** with respect to their ACPA claim and denied as moot

as to all other claims and dismissed the plaintiff-appellant's claims. On March, 28, 2013,

the plaintiff-appellant timely filed for an interlocutory appeal on the district court's

decision in its Opinion and Order granting the partial summary judgment (2nd circuit

DOCKET 13-1162cv). On July 17, 2013, the 2nd circuit dismissed the interlocutory

appeal stating the district court's proceedings have not concluded with a final order **(See**

**Add. 4).** On Feb 28, 2014, the magistrate judge (Pohorelsky, V) issued a Report and

Recommendation, an opposition to that was filed by the plaintiff-appellant. The Report

and Recommendation was adopted by the district court in a Summary Order on March

26, 2014 **(See Add. 5: Summary Order).** On March 27, **2014,** a final judgement was

issued to order the judgement of $32,000 and the transfer of the at-issue domains **(See**

4

**Add. 6: Final Judgment).** On April 25, 2014 the plaintiff timely appealed (this instant appeal 14-1554cv) **(See Add. 7: Notice of Appeal)**, with the docketing fee paid. On April 25, 2014, the plaintiff filed for motion for reconsideration, which stayed this instant appeal until the motion was denied by the district court on March 3, 2015 **(Add. 8: Deny to Reconsider).**

On March 19, 2015, the defendant party, knowing that this instant appeal was proceeding, changed the status quo of the case by attempting to enforce the district court order which was for an award of $32,000 and the transfer of the domain names. The defendant failed partially in their attempt when they failed to enforce the $32,000 award but was able to mislead the GoDaddy Inc domain registrar to transfer the at-issue domain names. The current registry record on http://who.godaddy.com for the at-issue domain currently shows the transfer on March 19, 2015 to the defendant. The plaintiff-appellant is currently trying to rectify this by contacting the registrar with the appeals document showing that the appeals is active. For purposes of consideration, the at-issue websites are currently only accessible through the Hosting company's direct URL directory link due to transfer of the domain names.

trumpbeijing.com via
(http://www.sport202.byethost3.com/trumpbeijing.com/) and
(http://www.sport202.byethost3.com/trumpbeijing.com/cn/)

trumpmumbai.com via
(http://www.sport202.byethost3.com/trumpmumbai.com/dn) and
(http://www.sport202.byethost3.com/trumpmumbai.com/)

trumpindia.com via
(http://www.sport202.byethost3.com/trumpmumbai.com/in/) and
(http://www.sport202.byethost3.com/trumpmumbai.com/)

http://trumpabudhabi.com via
(http://www.sport202.byethost3.com/trumpabudhabi.com/rn/) and
(http://www.sport202.byethost3.com/trumpabudhabi.com/)

# SUMMARY OF ARGUMENTS

The plaintiff-appellant contends the following in summary

**The Plaintiff-Appellant's Websites are Non-Commercial Speech.**

The argument here is that the at-issue website's content is of non-commercial speech nature. Commercial law consideration for improper commercial use should not be applied because at-issue website is have no consumer activities and non-commerical.

**The Plaintiff-Appellant's Website Contain Protected Consumer Commentary**

Here, it is argued that consumer commentary as in criticisms found on the at-issue website are protected and further explains negative commentary about products and services can't be "shut up" just because the affected party, like a business, dislikes the negative commentary.

6

**The at-issue mark's "Distinctive" or "Famous" attributes consideration**

The summary of arguments here is that the defendant-appellee used the at-issue mark in their generic meaning for running businesses in casino card gambling and general gambling with others for the promotion of their products and services, thus making their at-issue mark not "distinctive". The argument here also contends the district court were arbitrary and/or capricious in applying its standards.

**Not Confusingly Similar**

The summary of argument here is that the determination of the district court shown itself in the Opinion and Order that the plaintiff-appellant website is distinguishable from the defendant-appellee in its aesthetics remarks about the at-issue domain's website. There's also a disclaimer clearly stating the website is not endorse by the interests of the defendant-appellee. The argument here also forwards the point that its highly unlikely that the defendant-appellee would post negative commentary about its own products and services on the at-issue domains. With stated, the at-issue domains website is not confusingly similar.

**There is no cybersquatting**

This argument contends that the determination of the ACPA for cybersquatting must find that bad faith to profit which is shown not to be the case in this dispute along

with case references to show that point.

**Fair Use and First Amendment**

The summary here argues that the at-issue domains' were of fair use and consumers were not harmed nor confused since there is no element of consumerism and there's nothing to sell on the at-issue domains and asks the appropriate inquiries for the protection of free speech. Free speech protection is also forwarded since the content on the at-issue website contains critical and political commentaries. The safe harbor protection of the ACPA is argued as well.

**Laches protection**

The summary of the argument here is that defendant-appellee "should of known" about the domain names in regards to defending their rights given their first-hand exclusive knowledge and their expertise in domain names. They willfully slept on their rights for the purposes waiting to see how their business dealings would develop overseas, where it was unreasonable for them to wait while expenses and efforts were put in to establish the at-issue websites.

**The district court used inconsistent arbitrary and capricious standards**

This argument is presented within the other arguments where it is shown that in the determination of the district court, the district court used various arbitrary

inconsistent standards for the amount of content to qualify protection under the 1st amendment of free speech while in other referenced cases it only require a webpage with one paragraph of content to qualify without consideration for aesthetics. Also, the district court reason that the plaintiff-appellant had an intent to profit without providing any proof while it has been presented with non-commercial content and use (and its still available online), so as to not provide free speech protection. The district court in many aspects discussed below, provided an inconsistent standard in its determination including the determination to award damages.

## ARGUMENTS

### 1. The Plaintiff-Appellant's Websites are Non-Commercial Speech.

An analysis of whether plaintiff-appellant's use of defendant-appellee's trademark is commercial or non-commercial speech is important in trademark infringement actions. First, Congress has limited the application of the Lanham Act, which has the ACPA, to cases involving commercial speech[1] The Lanham Act[2], by its very terms applies only to marks used "in connection with the sale, offering for sale, distribution or advertising of any goods or services…", along with ACPA, is aimed to protect consumers and consumerism. As such, the first inquiry is to determine whether plaintiff-appellant used

---

[1] See 15 USC 1125(a)(1)(B) and (c)(4)(B). See also, *Semco v Amcost*, 52 F3d 108, 111-112 (6'hCir 1995) (quoting extensively from the legislative history).
[2] 15 USC. 1114(l)(a).

the Domain Names and websites in connection with the marketability of any goods or services. Although the district court had vaguely concluded that plaintiff-appellants have engaged in a commercial use for a "scheme to capitalize" on the at-issue domains, a plain review of the content of plaintiff-appellant's website reveals that plaintiff-appellant's use of the website was purely non-commercial[3]. The website contains no advertisements and does not sell or promote any goods or services. Further, there are no links on the website to any other site that sells or promotes any goods or services.

In due consideration, courts have not hesitated to afford full First Amendment protection against a trademark holder's claims of infringement when an action is brought against a plainly non-commercial use of a trademark for either political or consumer commentary.[4] Indeed, if courts were to allow suits like defendant-appellee's to proceed, any company dissatisfied with a bad review of its products or services-whether in a website, or in a printed newspaper or magazine-would be able to bring a trademark action to halt publication of the unwanted review.

In *Bosley Medical Institute, Inc. v Kremer*, 403 F3d 672 (91 Cir 2005) defendant created the website www.bosleymedical.com to criticize plaintiff, who had a registered

---

3      Due to the fact that the at-issue domains were transferred on March 9, 2015 by the defendant-appellee, the only way to access the at-issue website, showing the current content, is through the Host Account URL which is listed in the Statement of Facts of this brief in the last paragraph.

4      See *L.L.Bean v Drake Publishers*, 811 F2d 25, 33 (1ᵗ Cir 1987); *ACLU of Georgia v Miller*, 977 F Supp 1228, 1233 (ND Ga 1997); *Bally Total Fitness Holding Corp v Faber*, 29 F Supp 1161, 1167 (CD Cal 1998); *Lighthawk v Robertson*, 812 F Supp 1095, 1097-1101 (WD Wash 1993); *Stop the Olympic Prison v United States Olympic Comm.*, 489 F Supp 1112, 1124-1125 (SDNY 1980). See also, *Lucasfilm v High Frontier*, 622 F Supp 931 (DDC 1985) (ruling on non-constitutional grounds).

trademark for "Bosley Medical." The bosleymedical.com website did not offer any

goods or services. It did, however, provide a link to another website critical of Bosley

Medical which did contain advertisements of Bosley's competitors. The court dismissed

plaintiff's claims and granted summary disposition of the plaintiffs' claims under the

Lanham Act, finding that there was no commercial use of plaintiff's trademarks. In so

doing, the court rejected plaintiff's arguments that the site was commercial because it

contained links to other sites that contained advertising and there was no evidence that

plaintiff-appellant sought to profit or extort money from plaintiffs, and finally the

website did not prevent Internet users from obtaining plaintiff's goods and services. In so

ruling, the court rejected the notion that the Lanham Act is violated when a party uses

the trademark of another as its domain name simply because customers may be deterred

from reaching the trademark holder's website[5] (See also, *Ford Motor Company v 2600*

*Enterprises*, 177 F Supp 2d 661 (ED Mich 2001). Further, the allegation of commercial

injury to plaintiff's business does not make defendant's website commercial speech.

*Nissan Motor Co. v Nissan Computer Corp.*,378 F.3d 1002, 1016-1017 (91 Cir. 2004).

In *Organization for a Better Austin v Keefe*, 402 U.S. 415 (1971), the Court held that it

was an improper prior restraint to enjoin the defendant from disseminating pamphlets

about the plaintiff realtor that alleged that plaintiff was engaged in "panic peddling." In

so ruling, the Court stated: "No prior decisions support the claim that the interest of an

---

[5]     *Bosley,* supra at 679 (rejecting the holding in *People for the Ethical Treatment of Animals  v Doughney*, 263 F3d
359 (4" Cir 2004).

individual in being free from public criticism of his business practices in pamphlets or leaflets warrants the use of the injunctive power of a court." *Id.* at 419. Similarly, in *Procter & Gamble Co. v Bankers Trust Co.*, 78 F.3d 219 (6th Cir. 1996), the Sixth Circuit invalidated as an abuse of discretion a preliminary injunction against the publication of Business Week magazine, and squarely rejected "private litigants' ... commercial self-interest" as a basis for a prior restraint, thus overturning a preliminary injunction that had been issued in favor of a company whose private documents had been discussed in a news publication. *Id.* At 225.

This instant case is also similar to *Taubman v Webfeats*, 319 F3d 770, 775 (6th Cir 2003). In that case, the defendant established a website praising a local shopping mall at www.shopsatwillowbend.com, using the trademarked name of the mall both on the website itself and in the domain name. After the shopping mall owner sued him over the first website, he created a second site to criticize the shopping mall's owner at www.taubmansucks.com, which contained the trademark of plaintiffs. The court ruled that "[a]s long as [defendant] has no commercial links on either of his websites ... we find no use 'in connection with the advertising' of goods and services to enjoin, and the Lanham Act cannot properly be invoked."

As such discussed above, the plaintiff-appellant contends the district court erred in its determination in not finding for the non-commercial speech and political speech protection provided by the Lanham Act/ACPA.

12

## 2. The Plaintiff-Appellant's Website Contain Protected Consumer Commentary

Please note, consumer commentary is speech protected by the First Amendment, *Base Corp. v Consumers Union*, 466 U.S. 485 (1984), as it applies to speech on the internet as well, *Reno v. ACLU*, 521 U.S. 844 (1997). Critical speech/opinion of a commercial company's products/services or practices has been found to be protected free speech[6]. More over, the appellate court have found that website's and website content like the plaintiff's that shows commentary about the markholder's products/services, such as the defendant-appellee's TV show "The Apprentice", and does not compete with them are protected against legal attempts to silence such commentary through the trademark laws and related laws. See, e.g., *Universal Communication Systems v Lycos, Inc.*, supra; Bosley *Medical Inst. v Kremer*, 403 F .3d 672, 679-80 (9'h Cir. 2005); *Lamparello v Falwell*, 420 F.3d 309, 313 ( 4'h Cir. 2005); *TMI, Inc. v Maxwell*, 368 F .3d 433 (5'h Cir. 2004); *Taubman v WebFeats*, 319 F.3d 770 (6m Cir. 2003); *CPC Int'l v Skippy, Inc.*, 214 F.3d 456, 562 (4m Cir. 2000).

As these courts have recognized and stated,

"it is important that trademarks not be 'transformed from rights against unfair competition to rights to control

---

[6]     *Semco v Amcast*, 52 F3d 108, 111-114 (6'h Cir 1995); *Porous Media Corp v Pall Corp.*, 173 F3d 1109, 1119-1121 (8'h Cir 1999); *US Healthcare v Blue Cross of Greater Philadelphi*a, 898 F2d 914, 927-939 (3d Cir 1990); *Mattei v MCA Records*, 28 F Supp 2d 1120, 1144-1145 (C.D. Cal. 1998).

language." *Lemley, The Modern Lanham Act and the Death of Common Sense*, 108 Yale L.J. 1687, 1710-11 (1999). Such a transformation would diminish our ability to discuss the products or criticize the conduct of companies that may be of widespread public concern and importance." *Id.*, 214 F.3d at 462.

Also stated in the 9th Circuit, "much useful social and commercial discourse would be all but impossible if speakers were under threat of an infringement lawsuit every time they made reference to a person, company or product by using its trademark." *New Kids on the Block v. News America Pub! 'g*, 971 F.2d 302, 307 (9'h Cir. 1992).

The plaintiff-appellant used the domain names truthfully to denote the page where the defendant is discussed. The use of trademarks to help identify the subject matter of consumer commentary on a website, therefore, is not a use against which the trademark laws and related laws are designed to protect. Whats more, the at-issue websites is used to express opinion about the defendant-appellee and related opinions on political topics **(See the URL address in Statement of Facts [last paragraph])**. "Any injury to [Defendant] ultimately arises from its being criticized on the website." *Universal Communication Sys.*, 478 F.3d at 423; see also Bosley, 403 F.3d at 680 ("Any harm to Bosley arises not from a competitor's sale of a similar product under Bosley's mark, but from Kremer's criticism of their services. Bosley cannot use the Lanham Act either as a

14

shield from Kremer's criticism, or as a sword to shut Kremer up."). It does not matter

whether the criticism directed at the markholder is considered legitimate or illegitimate-

or even whether it is true or false. To the contrary for the consideration of relevant laws,

"if the injury alleged is one of critical commentary, it falls outside trademark law,

whether the criticism is warranted or unwarranted." *Universal Communication Sys.*, 478

F.3d at 424.

As supported and discussed above, the plaintiff-appellant contends the district

court erred in its determination in not finding protection for the at-issue website's

consumer commentary in consideration for the Lanham Act/ACPA.

### 3. The at-issue mark's "Distinctive" or "Famous" attributes consideration

The considerations addressed in the district court's Opinion and Order, which

granted partial summary judgment, lacked several key elements in deciding this prong of

the ACPA. The defendant-appellee had and still uses the generic dictionary meaning of

the English word trump for card game meanings to promote his past and/or current

commercial businesses like casinos, hotels and related businesses. The word "trump

card" used in the defendant's businesses promotions and operations is a direct play on

the generic word meaning and connotations. The word "trump" is a generic "dictionary

word" that means "any playing card of a suit that for the time outranks other suits, such

a card being able to take any card of another suit." Its been stated in previous reasoning

of the district court that generic words get protection after used in association with non

15

generic products and services. Please understand that it is common knowledge among consumers that the use of the idea "trump card" by the defendant-appellee directly for its generic meaning and please see the below images.



An example of the trump card for casino gaming at Trump Plaza casino and hotel.

16



The trump card used in titled of a book by

one of the defendant's personalities titled,

"The Trump Card" ISBN 9781439140154

(redacted because they are not at relevance

in this dispute)

Please also be aware, the defendant-appellee's businesses had or still runs some

form of casinos where gambling card games are one of the centered form of products

and services provided as the Defendant's submitted documents also have touted.  In

addition, the defendant-appellee's business personalities sell books that provide explicit

use of the words like "trump card" as shown above.  What's more, the defendant-

appellee's organizations and businesses touts "trump" or "trump card" with its generic

17

meaning and suggestions as a superior form of credentials similar to card game

meanings for promotions in products and services for better commerce service

experiences like luxury golfing, casino card gaming, along with other combined service

experiences like luxury "hotels" and "real estate" using the generic meaning of the

dictionary word for suggestions of "better" or "higher value card or quality". The

argument of the defendant-appellee's use of the word trump in this instant dispute is not

totally and completely distinctive when considered in connection with defendant-

appellee's businesses as described and illustrated.

　　To elaborate further for this consideration, the defendant-appellee never promoted

any product or services in connection with the at-issue domains, so there's no reasonable

associated knowledge of existence to defendant-appellee's commercial businesses or

services that could have harm any reasonably knowledgeable internet using consumer.

The defendant-appellee never owned the entire geopolitical boundaries of the at-issue

domains' stated places of Beijing, Mumbai, India and Abu Dhabi. The at-issue domain

names, with their stated geopolitical names, does not state or imply buildings, towers,

residential or business or govt infrastructures and so to suggest anything else is really a

bit bias for commercial reasons and arguments. Without proper reasoning, the

defendant-appellee could now have rights to trumpet.com because it may be confused

for entertainment operations relating to defendant's entertainment businesses even

though it spells out the word for a musical instrument. Similarly with the use of ill-

18

informed reasoning, the defendant could now have rights to every possible combination of spelling with the generic word "trump" like FelineTrump because just by the name its the defendant's without consideration of other common sense and reasonable factors like efforts to provide clarification, the topic and content of the website and use in such a case.

With the above stated, the arguments, supporting statements and submitted evidence should provide sufficient consideration that would allow the finding that would "undermine the strength or validity here" with regards to the word "trump" for the consideration of the ACPA and as a matter of law.

In the Partial Summary Judgment decision in the Opinion and Order **(See Add. 3: Opinion and Order)**, the district court determines the trump mark to be incontestable by naming various business run by the defendant-appellee but omitted one most important and notable one, casino gaming and casino card gambling. That product and services is provided at Trump Plaza Casino, Trump Taj Mahal, Trump Marina Casino and others which was widely promoted and reported in the news for its recent business transactions). The district court, in its determination in its Opinion and Order, seems to ignore about this general public knowledge (Trump named gambling casinos are located near NYC in Atlantic City, NJ and also in Las Vegas, NV; The Trump Named Casinos have been promoted in the "Apprentice" named shows featuring the individual defendant-appellee) and just arbitrary omit that fact for consideration and discussion for

mark distinctiveness and protection to unfairly favor the defendant-appellee in its

determination for this dispute.

With the stated above, the plaintiff-appellee contends that the district court erred

in its determination of the defendant's distinctive mark in the consideration of the

Lanham Act/ACPA by applying standards arbitrarily and/or capriciously.


## 4. Not Confusingly Similar

With some discussion on this matter, even if plaintiff-appellant's use of defendant-

appellee's mark was commercial, a violation for the finding of the at-issue website to be

confusingly similar for the consideration of the ACPA and related concerns occurs only

if the use creates a likelihood of confusion for the consumers. "Whether there is a

likelihood of confusion is a mixed question of law and fact." *Champions Golf Club v*

*The Champions Golf Club, Inc.*, 78 F3d 1111, 1116 (6th Cir 1996), citing *Wynn Oil Co.*

*v Thomas*, 839 F2d 1183, 1186 (6th Cir 1988). Trademark injury arises from an

improper use of a mark to denote the source of similar products sold by others-or, in the

case of dilution, to denote the source of dissimilar goods. *Wells Fargo & Co. v*

*WhenU.com*, 293 F.Supp. 2d 734, 754 (E.D. Mich.2003). The defendant-appellee cannot

establish the essential elements of an infringement claim under the Lanham Act or

ACPA; that is the purported infringement by plaintiff-appellent creates a likelihood of

confusion on the part of the consumer as to the source of the goods or services because

there's nothing to buy on the at-issue websites, only non-commercial content. *Daddy's Junky Music v Big Daddy's Family Music Ctr.*, 109 F3d 275, 280 (6'h Cir 1997).

The mere existence of the website, absent any offering of goods or services, cannot form the basis for defendant's cause of action under the Lanham Act and ACPA. "It is irrelevant whether customers would be confused as to the origin of the website, unless there is confusion as to the origin of the respective products." *Taubman*, supra at 776.

In addition, the fact that the name of Plaintiff's business appears in the domain names registered by plaintiff to denote the subject matter of the website is not determinative. In *Strick Corp. v Strickland*, 162 F Supp 372 (ED Pa 2001) the court found no likelihood of confusion because, once an Internet user reached the defendant's website, it would be crystal clear that the Strick company was not the sponsor of the strick.com website. The court explained that the claim of likelihood of confusion was based upon the doctrine of "initial interest confusion," namely the concern that an internet user might be misled into coming to the "junior" user's website, and then either decide to buy goods from the junior user, or lose interest in looking harder for the trademark holder. *Id* at 3 77. However, the court for that dispute refused to find a trademark violation in the context of the internet, explaining:

> [A]ny initial confusion that arises form Defendant's use of his
> strick.com domain site, specifically, that consumers will
> realize that they are at the wrong site and will go on an Internet
> search engine to find the right one, is not enough to be legally

21

significant. .. It is clear that Internet surfers are inured to the
false starts and excursions awaiting them and are likely to be
dissuaded, when, after taking a stab at what they think is the
most likely domain name for a particular website guess wrong
and bring up another's webpage. [Going on to reject plaintiff's
dilution claim, ] It is clear that nothing in trademark law
requires that title to domain names that incorporate trademarks
or portions of trademarks be provided to trademark holders. To
hold otherwise would create an immediate and infinite
monopoly to all famous mark holders on the Internet, by which
they could lay claim to all .com domain names which arguably
are 'the same' as their mark. The Court may not create such
property rights-in-gross as a matter of dilution law ...
Trademark law does not support such a monopoly. *Id* at
380.23

To further, similar principles have been applied where the reason for registering a

domain name including the trademark of another is to comment on the trademark holder.

There is a number of those cases involved domain names including the trademark

accompanied by the words like "sucks." (See *Lucent Technologies v Lucentsucks.com*,

95 F.Supp2d 528 (ED Va 2000); *Bally Total Fitness Holding Corp. v Faber*, 29 F

Supp2d 1161 (CD Cal1998); See also, *Ford Motor Company v 2600 Enterprises*, 177 F

Supp 661, 664 (ED Mich 2001). However, the court also found no likelihood of

confusion in *Northland Ins Co v Blaylock*, 115 F Supp2d 1108 (D. Minn 2000) where

Defendant registered the name "northlandinsurance.com", the name of the plaintiff's

business. The website criticized plaintiff's business. The court for that dispute ruled that

the website was not likely to cause confusion despite the fact that the name of plaintiffs

business was the domain name, rejecting plaintiff's "initial interest confusion" argument.

Moreover, there is nothing illegitimate or confusing about the fact that Defendants'

domain names page of that case appears in a list of search engine results obtained when

entering Plaintiff's mark as a search term, because, as courts have recognized, Internet

users use search engines to find critiques of trademark holders as well as the

markholders' own websites. *Playboy v Welles*, 278 F.3d 796, 803-804 (9'h Cir. 2002). To

be sure, Plaintiff might prefer to squelch public access to Defendants' website by

excluding it from search engine results, but such suppression is not a proper function of

trademark law. *CPC Int 'l v Skippy*, Inc., 214 F.3d 456,462 (4'h Cir. 2000). See generally

*Goldman, Online Word of Mouth and Its Implications for Trademark Law* (Oct. 2007),

available at http://papers.ssm.com/sol3/papers.cfm?abstract id=l020695. By providing a

reasonable review of the at-issue website, would anyone possibly be deceived or believe

that the defendant has created this website to provide political content and criticism

itself while noting the design differences stated in the district court's opinion? Most

definitely not. Any reasonable consumer actually looking to learn of the defendant-

appellee or go to its website would immediately realize that at-issue website is not the

home page of the defendant-appellee. Any references to defendant-appellee's marks on

the at-issue website "cannot mislead consumers into buying a competing service" as no

commercial service or product is offered even when no customer will mistakenly

purchase services from plaintiff-appellant under the belief that the service is a different

alternate competitor, when its purely non-commercial in actuality -"[t]he dangers that

the Lanham Act was designed to address are simply not at issue in this case." *Bosley*,

403 F.3d at 679-80; see also *Parker v Google, Inc.*, 422 F.Supp. 2d 492 (E.D. Pa. 2006).

Anything to suggest that an intent to confuse the consumer by the use and

presentation of the at-issue domains and its website is quash by the fact there is no

evidence of promoting the at-issue domains as in competition in anyway to the

defendant-appellees businesses and also the fact that there is a large distinct disclaimer

on the front page that says, ("The content and this website has NOT been approved by

Donald Trump, or by the Trump Organization, or by the shows "The Apprentice"/"The

Celebrity Apprentice". "). As the letter of the ACPA and its details illustrates, the

material issue and matter of law application is consumer protectionism, where the at-

issue domains' website have nothing to sell nor engage in any form of consumerism or

profiteering. In order for any consumer confusion to occur, a reasonably knowledgeable

internet user/consumer must be notify of the existence of such domain names are

"registered and available online" first because before initial domain name registration,

there was no knowledge and therefore no internet traffic. Knowledge and internet traffic

is generated by word of mouth or active promotion of what the website provides. In

order to have any real life common sense reasonable harm done to any reasonably

knowledgeable internet using consumer, there must be some form of promotional

material to tell the consumer of 1. the existence and online availability of the domain

names' websites and 2. brief material description to show what it is using common sense

24

approaches as stated. All in all, there have been no proven evidence that the plaintiff-appellant have intended to confuse anybody but only of the opposite, which is to specify and clarify what the at-issue domains' website are of non-commercial nature while having cognizant consideration to the very limited availability of relevant domain names while being able to register interesting unique, meaningful, easy to remember, ease of keyboard type ability, relevant and register-able, because its well known that many high relevance domain names are already taken. The most convincing detail to dispel any notion of possible harm to consumers in consideration to this is that you can't buy anything on the at-issue domain names' website. Whats more, any argument for the following is wrong. ("A significant purpose of a domain name is to identify the entity that owns the [website]. Customers searching for a company's website will often search using a domain name identical or similar to the company's name or mark ....Customers unable to locate [a plaintiff-appellants] website using domain names identical to its marks, ... may fail to continue to search for [the plaintiff-appellants] own home page, due to anger, frustration, or the belief that [the plaintiff-appellants] home page does not exist." (quoting *Pinehurst, Inc. v. Wick*, 256 F. Supp. 2d 424, 431 (M.D.N.C. 2003)) (alterations in original). For one, there's no evidence to support any relevant search result shown to misdirect or confuse any reasonably knowledgeable internet using consumers. A general leap of uninformed faith in this reasoning is irresponsible and displays a rather unreasonable bias. And also, there is no evidence that the defendant-

25

appellee was robbed of any businesses or were given extortionate demands.

For the reasons and arguments stated above, the plaintiff-appellant contends that the district court's determination for confusingly similar under the Lanham Act/ACPA for the "confusingly similar" have erred in this matter.

## 5. There is no Cybersquatting

Its generally axiomatic that a disgruntled customer who uses a mark to register a critical commentary, a complaint or gripe, is not liable under the anti-cybersquatting provisions of the Lanham Act (ACP A). In *Lucas Nursely and Landscaping, Inc. v Grosse*, 359 F3d 806 (6'h Cir 2004), the homeowner defendant registered the domain name "lucasnursery.com" wherein she criticized Plaintiffs work at her home and her unfavorable experience. The court in dismissing Plaintiffs complaint of that dispute stated that in order for liability to attach under ACPA a court must initially conclude that defendant's acts constitute "bad faith intent to profit" from the use of a mark held by another. *Id.* at 809. Simply stated, the acts of Defendants simply do not constitute cybersquatting as alleged. As succinctly noted in Lucas Nursery at 810:

> The paradigmatic harm that the ACPA was enacted to eradicate - the practice of cybersquatters registering several hundred domain names in an effort to sell them to thelegitimate owners of the mark- is simply not present in any of Grosse's actions. In its report on the ACPA, the Senate Judiciary Committee distilled the crucial elements of bad faith to mean an "intent to trade on the goodwill of another's mark." S. Rep. No.I 06-140, at 9. See also, *Ford Motor Co. v*

26

> *Catalanotte*, 342 F.3d 543,549 (61h Cir. 2003)("Registering a
> famous trademark as a domain name and then offering it for
> sale to the trademark owner is exactly the wrong Congress
> intended to remedy when it passed the ACPA.").

There are nine (9) separate factors the court considers in determining whether the

defendant acted in "bad faith." *Sporty's Farm v Sportsman's Market*, Inc., 202 F3d 489

(2"d Cir. 2000). However, as stated by the court in Lucas:

> The role of the reviewing court is not simply to add factors and
> place them in particular categories, without making some
> sense of what motivates the conduct at issue. The factors are
> given to courts as a guide, not as a substitute for careful
> thinking about whether the conduct at issue is motivated by a
> **bad faith intent to profit**.

As already noted, the plaintiff-appellant never made a profit from the at-issue

domains nor attempted to make a profit and have never contacted the defendant-appellee

to offer to sell the at-issue domains.

In *Lucas*, the Court found the actions of the defendant "were undertaken in the

spirit of informing fellow consumers about the practices of a landscaping company that

she believed had performed inferior work on her yard." Defendant did precisely the

same thing. It informed fellow would-be investors about the practices of Plaintiff. "The

practice of informing fellow consumers of one's experience with a particular service

provider is surely not inconsistent with [the ACPA]." *Id* at 811.

With the stated above arguments, the district court have erred in this determination because there is no bad faith in the registration of the at-issue domains and non-commercial use.

## 6. Fair Use and First Amendment

To address the issues here, there is no commercial source misidentification for profit, consumer is not harmed because there is no evidence that show consumer were confused. There is no reasonable finding that the domain names alone will cause confusion in addition to actually promote a website's purpose so people will know like amazon.com or yahoo.com. There is no proven evidence that such at-issue domains did actually confuse any consumer added that a rather large disclaimer was there on all at-issue domains' websites. It clearly states the non-commercial use of the website is not by the defendant-appellee. To find that the mere domain names alone would cause confusion "for consumers" without reasonable consideration of website content and use is rather irresponsible. Again, it's a non-commercial website, nothing was selling or sold. The court is urged to see this in regards to this consideration. The domain names itself cannot be used as a determining factor to invalidate protection for free political speech/expression/opinion. Everybody in the world knows, due to severe limited availability of common and high relevance domain names for registration, many internet

entities have to use alternative ways to register for domain names that would still make sense and still have relevance. For example, if one is to publish an online opinion blog on politics, the most common sense choice of a domain name would be politics.com which is already taken, because its an obvious high relevance domain in terms of relevance to its topics. Taken to more real life situations and reasoning, just like the amazon.com owner cannot be held liable for any fault of misidentification of source and purpose for the amazon rain forest or for the amazon region or related tourism business just by relying on their domain name because they expressed on their site through disclaimers and related efforts that clarifies that its a popular online retailer. With more reasonable understanding on the matter, free speech protection cannot be denied just because a domain name registrant cannot find the first choice available domain names that could of provided a better means of communication about its source. Rather in reality, a registrant have to find alternative domain names or combinations of words or mis-words that still preserve some common sense relevance and reasonable conciseness in letter/character lengths. Some more example like tumblr.com, for word a misspelling alternative and baidu.com for use of transliteration of chinese language word pronunciations, and alibaba.com (just like similar reasons like amazon.com) and godaddy.com for combination of words alternative and many others, each domain name alone does not show much to communicate any significance about its use, content and source until its explained in the disclaimers and explanations and similar efforts from

29

its content. So in other words, common sense shows in the current state of the internet that using the domain names alone as a significant factor to determine fault or to consider law protection in this instant dispute or any relatable dispute is faulty, not in touch with the real world and a bit irresponsible.

As elaborated and explained, the Plaintiff maintains the position that the Plaintiffs registration and use of the at-issue domain names does not run afoul of the ACPA.

With other matters, the references to a number of other cases for authority in the Opinion and Order for the finding partial summary judgment cannot be applied to this instant dispute. A few reasons, the other cases deals with considerations of for-profit consumerism activities. The Planned Parenthood case referenced for authority is the exact point where there's an element of commerce. See *Planned Parenthood Fed 'n of Am., Inc. v. Bucci*, 1997 WL 133313 (S .D.N.Y. Mar. 24, 1997), 920 (2dCir. 1998) Any case referenced for authority should be considered in the context that it deals with non-commercial fair use activities to express free speech and political speech.

> The Second Circuit has explained that "[d]omain names ... per se are neither automatically entitled to nor excluded from the protections of the First Amendment, and the appropriate inquiry is one that fully addresses particular circumstances presented with respect to each domain name." *Name.Space, Inc. v. Network Solutions, Inc.,* 202F. 3d 573, 586 (2d Cir. 2000).

30

The appropriate inquiry should find that each at-issue domains are for non-commercial fair use, to express ideas and views in politics, prospective governmental economic policies, political scandal avoidance, and other ideas to preserve the environment and should be protected under the Freedom of Speech 1st Constitutional Amendment.

Please be reminded that the safe harbor protection is not limited by subjective matters like the amount or "scant" threshold of amount content, (as arbitrarily applied by the district court as a standard for its determination), human taste on content aesthetics or quality nor political affiliation or opinion expressed nor the materials posted to be dated for how long ago. The safe harbor is intended for the protection of non-commercial fair use for expression of free speech/opinion and political speech/opinion. Material contents have been posted there long before the commencement of this dispute and have since updated many times so any reasoning to find the intent of benefiting from safe harbor by posting token content is rather subjectively faulty and a bit capricious. As a matter of material fact, the at-issue websites content uses a CMS software (Content Management Software) used for content management, design and presentation (similarly like an web email or website design management software more commonly use by internet users).

It was stated in Motion Decision...

However, he may not do so by using Defendant's mark to confuse people into visiting his websites. "The First

31

Amendment protects an individual's right to speak out against
a markholder, but it does not permit an individual to suggest
that thee markholder is the one speaking." *SMJ Grp., Inc. v.
417 Lafayette Rest. LLC*, 439 F. Supp. 2d 281 , 291 (S.D.N.Y.
2006).

To address the above, the reasonable effort by the Plaintiff-appellant to put large

disclaimers on the front page and also with the reasoning that the aesthetics quality of

the content design noted by district court that its rather notably different from the

defendant-appellee's commercial websites' design should be sufficient to counter any

suggestion or finding that the at-issue domains' website is impersonating the defendant-

appellee because any reasonably knowledgeable internet using consumer would be able

to tell the difference as did the district court's own reasoning in the Opinion and Order.

The safe harbor specification clearly protects the expressions and political

expressions on the at-issue domains' websites. Similarly, please observe the following

from a similar case that has set a precedent ... [ *Career Agents Network, INC. et al v.

White et al* (Case No. 2:09-cv-12269: Eastern District of Michigan)] by Honorable

Judge Cleland's judgment document.. ..

Defendants have used Plaintiff's trademark only in a non-
commercial way, to criticize the business practices of Plaintiff.
Defendant's critical commentary is protected by the First
Amendment and cannot form the basis for a claim of
trademark infringement, nor the basis for the issuance of
injunctive relief. Further, there is no likelihood of confusion by
consumers and Defendants' website is quite distinguishable
from Plaintiff's official homepage. Finally, Plaintiff cannot

32

maintain an action for cybersquatting as bad faith, a necessary element, is non-existent.

In addition, please observe the following by Honorable Judge Denny Chin in another infringement claim case on matters of non-commercial and other fair use protection as it relates to this instant civil dispute ... [*The Authors Guild et al. v. Google et al.* (Case 05 Civ. 8136 (DC): SDNY)

> Even assuming plaintiffs have demonstrated a prima facie case of copyright infringement, Google's actions constitute fair use here as well. Google provides the libraries with the technological means to make digital copies of books that they already own. The purpose of the library copies is to advance the libraries' lawful uses of the digitized books consistent with the copyright law. The libraries then use these digital copies in transformative ways. They create their own full-text searchable indices of books, maintain copies for purposes of preservation, and make copies available to print-disabled individuals, expanding access for them in unprecedented ways. Google's actions in providing the libraries with the ability to engage in activities that advance the arts and sciences constitute fair use. To the extent plaintiffs are asserting a theory of secondary liability against Google, the theory fails because the libraries' actions are protected by the fair use doctrine. Indeed, in the HathiTrust case, Judge Baer held that the libraries' conduct was fair use. See Authors *Guild, Inc. v. HathiTrust,* 902 F. Supp. 2d 445,460-61, 464 (S.D.N.Y. 2012) ("I cannot imagine a definition of fair use that would not encompass the transformative uses made by Defendants' [Mass Digitization Project] and would require that I terminate this invaluable contribution to the progress of

science and cultivation of the arts that at the same time effectuates the ideals espoused by the [Americans with Disabilities Act]."). The fair use analysis set forth above with respect to Google Books applies here as well to the libraries' use of their scans, and if there is no liability for copyright infringement on the libraries' part, there can be no liability on Google's part.

In similar goals and fashion, the at-issue domains' website attempts to contribute the advancement of the political and technological public discussion and thinking in promoting and suggesting useful ideas related to them, to prospective technologies (i.e. cross continent high speed rail, to help save the world of pollution and climate change by the municipalities adoption of generic LED lights to dramatically cut fossil fuel burning due to dramatic savings in energy generation), to prevailing national legal matters (i.e. marriage issues), to prospective and current politicians (i.e. avoiding scandals) and to matters on individual defendant's interesting topics (i.e. should we be providing free military protection to other well off countries) for the good of society on interesting tech, political and some related topics and things that many people were not concern about yet in a trans formative way of understanding.

The whole reasoning in this dispute is for the protection of consumer and consumerism as a matter of law. The astonishing fact of the matter is the at-issue domains' website has been used for non-consumer related and non-commercial expression of speech and political speech at all times. To validate any contentious point

34

for the defendant-appellee, one must find and show evidence of commercialism and/or selling something for profit, which no one has proven. The referenced authorities in the Motion Decision have been dealing with cases with an element of commerce and for protecting consumers and consumerism, which this case does not because as stated, its about the dispute for non-commercial free speech/expression and political speech/expression with just some bad aesthetics presentation of content due to the use of the Content Management System software (CMS).

Furthermore, even though the district court reasoned to find in favor for the defendant-appellee, the district court nevertheless erred because its reasoning cannot overcome a fair use or nominative-fair-use defense. *KP Pennanent Make-Up v Lasting Impression I*, 543 U.S. Ill (2004). Under settled law, a fair-use defense is established if the plaintiff-appellant used the plaintiff's mark (1) in its descriptive sense; and (2) in good faith. *ETW Corp. v Jireh Publ*, 332 F.3d 915, 920 (6th Cir. 2003). The first element is satisfied here because plaintiff-appellant's website does not use defendant-appellee's mark as a trademark-he does not use the mark to identify any product sold by plaintiff-appellant, but only as a descriptive term in consumer commentary. "Where, as here, use of the mark, as 'the only symbol reasonably available [to denote plaintiff as the subject of the commentary] does not attempt to capitalize on consumer confusion or to appropriate the cachet' of the mark holder, it fails to 'implicate the source identification function that is the purpose of trademark.'" *International Stamp Art v USPS*, 456 F.3d

35

1270, 1274 (11th Cir. 2006) (quoting *New Kids on the Block*, 971 F.2d at 308).

Secondly, the good-faith element is satisfied because plaintiff-appellant did not "intend[] to trade on the good will of the trademark owner by creating confusion as to the source of the goods or services." *Id.*. As discussed above, the possibility of consumer confusion is not implicated here, because the parties are not competitors. Because both elements of fair use are satisfied, the ACPA Safe Harbor defense should prevail.

Courts reach the same conclusion under the label of nominative fair use. See *Century 21 Real Estate Corp. v Lending Tree*, 425 F.3d 211 (3d Cir. 2005); *Mattel, Inc. v Walking Mountain Prods.*, 353 F.3d 792, 810 (9u' Cir. 2003); *New Kids on the Block*, 971 F.2d at 307. Although the Sixth Circuit has never decided whether to adopt the doctrine of nominative fair use, Congress has written the concept into the Lanham Act-"fair use includ[es] a nominative or descriptive fair use ... [and] includ[es] use in connection with ... identifying and parodving, criticizing, or commenting" upon the mark owner or its goods or services."(Emphasis added). 15 U.S.C. §1125(c)(3)(A)(ii). As such, plaintiff-appellant's use of the purported trademark falls squarely within the parameters of this provision and the use of defendant-appellee's marks are used only as reasonably necessary to identify defendant-appellee's products and services.

Plaintiff-appellant does nothing to suggest sponsorship or endorsement by defendant-appellee. Therefore, the district court should be found in error in its determination for these reasons in not granting fair use protection and the safe harbor

protection of the ACPA.

### 7. Laches protection

The defendant-appellee party admits that they register their domain names using the generic dictionary word "trump" with a geographical name for the market they are trying to do business in as a standard business "protocol", registering domains like [trumpchicago.com; trumphollywood.com; trumptoronto.ca; trumpwaikiki. com; trumpsoho.com; trumpistanbul.com.tr and trumpwaikiki.com], then the plaintiff-appellant would like to forward the idea, "What business protocol of large organization, knowing their own domain name acquisition strategy and general business strategy before anyone else, would allow a delay of over three (3) and a quarter year. What's more puzzling is the fact that in the Defendant's Declaration of Eric Trump, Eric Trump describes their expertise in the domain name matters and even exhibits numerous domain names that they owned, thus showing that they are proficient and knowledgeable about domain names and their registration, yet the Defendant-appellee, with all its exclusive knowledge and domain matter expertise and awareness, willfully "slept on their rights" by delaying over three (3) and a quarter years to bring a claim from the July 2nd, 2007 where Donald Trump Jr. reportedly made the initial trip to India.

In 2007, the defendant-appellee's son Donald Trump, Jr., an Executive Vice President of The Trump Organization, announced plans to build branded hotels and

luxury condominiums in Mumbai and Bangalore, India where the defendant-appellee have first hand knowledge of their business endeavors before anyone else while admitting to expertise in protecting their brands online as described in the deposition of Eric Trump.

Also, the media reported his visit to India in advance of that project as early as July 2, 2007 which further proofs the Defendant-appellee's first hand knowledge of his own business endeavors before anyone else and have first hand opportunity to register the then available at-issue domain names at that relevant time before anybody else with nearly three (3) months time to spare to register them by the defendant-appellee between July 2nd, and Sept 20th, 2007.

The important dates of the registration of the at-issue domains are:

27-Nov-07 trumpabudhabi.com (please note the later date)

20-Sep-07 trumpbeijing.com

20-Sep-07 trumpindia.com

20-Sep-07 trumpmumbai.com

Within that time, over three years and a quarter years that have passed, the plaintiff-appellant have renewed the registration of the at-issue domains three (3) times, and made expenses for developing the site. In addition, the plaintiff-appellant have build significant traffic, expended time and development resources (and an evolving and

38

increasing financial cost averaging above $90 per year to cover rising cost of hosting, licensing and development as new technology for content are added and with increasing traffic) and to provide content on the at-issue domains' websites with a wide range of protected free speech content from non-commercial political and non-political commentaries/criticisms, with hosted and original satire and parody contents using new web technologies like Google's, and shared complaint views on the poor quality reality TV show by the defendant-appellee.

In further detail, it was not until Oct. 27, 2010, that the defendant-appellee party's counsel sent their first legal letter demanding the transfer of the at-issue domains. So this along with previous argument strongly supports the assertion that the defendant-appellee knowingly and willfully delay their legal actions for over three (3) and a quarter years, if not more accounting for a reportedly earlier pre-planned India trip by Donald Trump Jr., since 2007 since the defendants are the first to have knowledge of their business endeavors as early as July 2nd, 2007. In common terms and reasonable legal standards[7], the defendant-appellee is reasonably out on his right to claim while taking into consideration of the deposition of the Defendant-appellee's representative describing the expertise in domain issues for protecting the defendant-appellee's interests supported by the portfolio of registered domains own by the defendant-appellee.

Also, to address a point in the Opinion and Order, in consideration of Laches, the

---

7       Many courts have applied two years limit to allow a trade mark holder to bring a claim

plaintiff-appellant does not have unclean hands. Furthermore, it was the plaintiff-appellant who first forward the unclean hands assertion on the defendant-appellant with submitted proof of the famous New Jersey Supreme court case where that the defendant-appellee admitted to be misleading the courts in a deposition and it was noted in the news media. (See http://www.huffingtonpost.com/2011/04/22/donald-trump-net-worth-deposition_n_852376.html) (See *Trump v. O'Brien*; SUPERIOR COURT OF NEW JERSEY; APPELLATE DIVISION; DOCKET NO. A-6141-08T3)

In the recent case of *Fitbug Ltd. v. Fitbit, Inc.*, 2015 WL 350923, No. 13-1418 (N.D. Cal. Jan. 26, 2015) Trademark holders like Fitbug, the plaintiff whose claims were barred by Laches considerations, "knew or should have known about its potential cause of action."...This standard can be satisfied by either actual or constructive knowledge, because "[c]ompanies expecting judicial enforcement of their marks must conduct an effective policing effort." For this instant dispute, given the way the defendant-appellee registers domain names as mentioned before and their first-hand knowledge of their own business plans, as the mentioned pre-planned India business trip, the defendant-appellee should have known about the at-issue domains. The facts shows the defendant-appellee unreasonably delayed their claim to the at-issue domains for over three and a quarter years because they "should of known" about the at-issue domains given their own stated business practices, one can say the defendant-appellee willfully slept on their rights because they were

40

waiting to see how their business interactions would proceed first in India.

To elaborate further, "Laches is an equitable time limitation on a party's right to bring suit, resting on the maxim that one who seeks the help of a court of equity must not sleep on his rights." *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 835 (9th Cir. 2002) (internal citations and quotation marks omitted).  A claim is only barred by laches if the defendant can show "(1) unreasonable delay by plaintiff in bringing suit, and (2) prejudice . . . ." *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 997 (9th Cir. 2006) (citing *Couveau v. Am. Airlines, Inc.*, 218 F.3d 1078 (9th Cir. 2000)).  Two issues determine whether a delay was unreasonable. "First [a court] assess[es] the length of delay, which is measured from the time the plaintiff knew or should have known about its potential cause of action." *Jarrow*, 304 F.3d at 838. After, the Court must "decide whether the plaintiff's delay was unreasonable." *Id*. The district court for this dispute in its reasoning should of address each in turn.  It was unreasonable for the claim of the at-issue domain names after three (3) and a quarter years of delay, after expenses and effort were made to establish the at-issue websites.  The district court did not sufficiently address those considerations in finding not to grant Laches protection for this dispute. The district court finds in stating "plaintiff-appellant registered the Domain Names in bad faith as part of a scheme to capitalize on the goodwill of another's trademarks. Thus, his intentional bad faith use of Defendant's trademark prevents him from benefiting from laches as a matter of law." **(See Add. 4: Opinion and Order)**  There was no

evidence nor findings showing financial intent to profit "to capitalize" nor were their any discussion on what standards was used for that determination.

For the reasons given above, the plaintiff-appellant contends the district court erred in its determination in not granting Laches protection.

## CONCLUSION

In conclusion, with all the above stated, the plaintiff-appellant respectfully asks this court to find that the district court's determination for this dispute have erred and the judgment be reversed.

Respectfully Submitted,

J. Taikwok Yung

Pro se Plaintiff-Appellant

# APPENDIX

## APPENDIX CONTENTS

| | Page |
|---|---|
| Appendix 1: Original complaint | App.1 |
| Appendix 2: Def's Reply to complaint with counter claims | App.11 |
| Appendix 3: Opinion and Order | App.33 |
| Appendix 4: interlocutory appeal decision 13-1162cv 2nd circuit | App.58 |
| Appendix 5: Summary Order | App.59 |
| Appendix 6: The final judgment | App.62 |
| Appendix 7: Notice of Appeal for this instant appeal | App.64 |
| Appendix 8: Order to deny Motion for Reconsideration. | App.65 |

ORIGINAL

RECEIVED
MAR 2 2 2011
PRO SE OFFICE

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF NEW YORK**   IRIZARRY, J.



CV11 - 1413

Web-adviso, J. Taikwok Yung

POHORELSKY, M.J.

 :

 :

Plaintiff,

 :

 :                    __ Civ. __

- against -

 :

 :

Donald J. Trump,

 : **COMPLAINT FOR**

 : **DECLARATORY**

 : **JUDGMENT**

 :

 :

Defendant.          x



---

### NATURE OF ACTION

[1.]    This complaint arises from the domain name dispute between Web-advsio, J. Taikwok

Yung and Donald J. Trump over the at-issue domains trumpabudhabi.com,

trumpbeijing.com, trumpindia.com and trumpmumbai.com (Donald J. Trump  v Web-

1

adviso - D2010-2220).  A decision was issued which granted the transfer of the at-issue domain names to Donald J. Trump which the Plaintiff believes the decision was unjust.  The Plaintiff is seeking relief to keep the at-issue domain names.

[2.]   The Plaintiff is requesting a declaration that the Plaintiff is entitled to the use of the disputed domain name, trumpabudhabi.com, trumpbeijing.com, trumpindia.com and trumpmumbai.com (hereinafter "at-issue domains"), and that there is no infringement of any trademark rights alleged by the Defendant, and that any alleged "trump" mark claimed to be owned by Defendant is invalid and/or unenforceable in the United States. This action arises out of the Declaratory Judgment Act, 28 United States Code §§ 2201 and 2202; the Anticybersquatting Consumer Protection Act, 15 United States Code §§ 1114 and 28 United States Code § 1331 (hereinafter "ACPA"); the trademark laws of the United States Titled 15 USC § 1051, et seq.; and the Uniform Dispute Resolution Policy paragraph 4(K) (hereinafter "Policy").

## THE PARTIES

[3.]   The Plaintiff, Web-adviso, is a web-developer and a "domainer" (the correct and non-ignorant term) group consisting of J. Taikwok Yung, a former U.S. Marine who hope to educate and interest other recent retired returning Marines living across the U.S. about the opportunities available on the INTERNET and also to properly and preemptively inform/prepare them against corporate evils that attempts to harvest their sacrifices and financial security in the name of corporate, wall street and real estate profits.  The Plaintiff's purpose is to acquire interesting and high value domain names and park them initially with domain parking service providers and/or build the website, if feasible, with interesting content which takes significant time to program, customize and debug the

2

back-end codes. The Plaintiff registered the at-issue domains with GoDaddy.com

registrar on Thur. Sept. 20, 2007 and Tues. Nov. 27, 2007.

[4.]    Donald J. Trump is a self-proclaimed personality and businessman with no specific

specialty in one industry. Instead Donald J. Trump dabbles in numerous endeavors

ranging from wealth-building education with those "come-on" infomercials

broadcasts at midnight targeting poor minorities to running a ultra low budget "no-

pay for non-winning contestants" TV game shows like "The Apprentice". Often times

he proclaims himself to be a billionaire (by bloated asset estimates) where numerous

sources have cast legitimate doubts about his true worth. His successes are often times

proclaimed in the media but when put in a closer view and study, its often a false facade

to disguise big business failures. He is known worldwide to have been such a failure in

running his businesses such as his casinos that one bankruptcy was not enough to

cheat the bondholders of their investments but that two bankruptcies have to be filed. In

addition to that, Donald Trump is known worldwide to butcher the legal system with

frivolous complaints as a vehicle to **harass people** ranging from suing an old lady who

wouldn't sell her home to Donald Trump's real estate construction plans and to suing

Hong Kong real estate tycoons, Henry Cheng and Vincent Lo, who got sued by Donald

Trump because they didn't want play golf with him and because they sold a real estate

property to a buyer not according to the liking of Donald Trump. Donald Trump's lawyer

is Todd Martin (866 United Nations Plaza NY, NY 10017)

(212) 813-5900 **JURISDICTION AND VENUE**

[5.]    Jurisdiction of this Court arises under the Federal Declaratory Judgments Act, Title 28,

United States Code, Sections 2201 and 2202; the ACPA, 15 United States Code § 1114

and 28 United States Code § 1331; Title 28, United States Code, Section 1338(a) and 15

3

United States Code, Section 1121.

[6.]   Venue properly lies in this district pursuant to 28 U.S.C. §§ 1391(b).


**FACTS**

[7.]   On Thursday Sept. 20, 2007, Plaintiff acquired the at-issue domain names

trumpbeijing.com, trumpmumbai.com, trumpindia.com and on Tues. Nov. 27, 2007,

acquired trumpabudhabi.com

[8.]   The at-issue domains were established as a mainly fan parody content site with some

news and commentary.

[9.]   On Friday, Dec. 17th, 2010, the Defendant filed an action with the World Intellectual

Property Organization (hereinafter "WIPO") Arbitration and Mediation Center alleging

that the at-issue domains was confusingly similar to its marks and that the Plaintiff used

the at-issue domains in bad faith.

[10.]   A WIPO panel ruled against Plaintiff and ordered that the at-issue domains

be transferred to Defendant.

[11.]   The Defendant filed their WIPO UDRP complaint after the fact the at-issue domains

have been registered since late 2007, meaning the Defendant delayed over 3 years

since registration of the at-issue domains to bring the WIPO UDRP complaint.

[12.]   The Defendant doesn't have any real estate under construction nor have established

offices in Abu Dhabi, UAE; Beijing, China; Mumbai nor in India before the filing of the

WIPO UDRP complaint.

[13.]   Please let the court recognize there are numerous coexisting trademarks containing or

comprised of the term "trump". The following words or alphabet combinations of

"trump", are used widely in domain names by numerous competing and non-competing

companies to Donald Trump and his organizations, that includes non-profit

organizations, musicians, personal blogs, ad-supported websites and etc. Likewise,

please let the court also recognize there are numerous domain names consisting of the

the spelling "trump" with different top-level domains or word combinations, none of

which the Plaintiff nor the Defendant owns:

trumpet.com

trump-art.com

trumpcareer.com

trumpcation.com

trumpclassrooms.com

and over 17,000 more...

[14.]   May the record show the Plaintiff never contacted the Defendant nor any other entities

or companies about the sale of the at-issue domains because the at-issue domains are

**NOT FOR SALE**.  It was the Defendant's party that initially sent a legal letter to harass

and threaten legal action and then filed the UDRP complaint.  Also, there was no active

advertisement of the at-issue domains that it was stated for sale.  There is no ads, no

statement to offer to sell nor any mechanism to try profit from the at-issue domains or its

websites.

[15.]   The Plaintiff never contacted the Defendant nor any other entity/company about the sale

of the at-issue domains.  It was the Defendant party that contacted the Plaintiff for a

bogus offer to settle and then  filed the UDRP complaint with WIPO.

[16.]   There was and still no active advertisement outside of the at-issue domains that it was

stated for sale.

5

## FIRST CLAIM OF RELIEF

### (Declaratory Judgment That Plaintiff's Use Of The At-Issue Domain Names Is In Compliance With The ACPA)

[17.]   Plaintiff incorporates each of the statements and allegations set forth in

paragraphs 1-16 above as if fully set forth herein.

[18.]   Defendant's attempt to acquire the at-issue domains constitutes

Reverse Domain Name Hijacking under the ACPA for the following reasons:

   a. Plaintiff is the registrant of the at-issue domains;

   b. Plaintiff's domain names was ordered transferred pursuant to the

   WIPO arbitration proceeding to the Defendant;

c. The Defendant has notice of the claim concurrent herewith;

d. The Plaintiff's use of the at-issue domains is not unlawful, as the

at-issue domains is not confusingly similar to the alleged trademark and generic  English

word "trump" and the use of the at-issue domains is not in bad faith.

[19.]   Plaintiff is entitled to a declaration that its use of the at-issue domains

is in compliance with the ACPA.

## SECOND CLAIM OF RELIEF

### (Declaratory Judgment of Invalidity and Unenforceability of the alleged trademark in the United States and Non-Infringement)

[20.]   Plaintiff incorporates each of the statements and allegations set forth in

paragraphs 1-19 above as if fully set forth herein.

6

[21.]   The Defendant's claim to the "trump" mark is invalid, unenforceable, and void and/or

Plaintiff's use of the at-issue domains does not infringe the Defendant's trademark, for

one or more of the following reasons:

a. The Defendant's claim to trademark rights of the English word "trump" is invalid

and/or unenforceable due to Defendant's failure to use the trademark in commerce as

defined under the trademark laws of the United States;

b. The at-issue domains does not infringe the Defendant's trademark as it is not

confusingly similar.

c. The at-issue domains does not infringe the alleged trademark as the at-issue domains

and the alleged trademark is not used in conjunction with similar services or products;

d. The at-issue domains does not infringe the alleged trademark as the term English

word "trump" alone is generic, as it stands for the meaning "any playing card of a suit

that for the time outranks the other suits, such a card being able to take any card of

another suit".

[22.]   Because the Defendant's claim to the alleged trademark rights of "trump" are invalid

and/or unenforceable, the Plaintiff is entitled to use of the at-issue domains.

[23.]   Because the at-issue domains does not infringe on the alleged trademark, the Plaintiff is

entitled to use of the at-issue domains.


WHEREFORE, Plaintiff prays for the following relief:


(a) Entry of judgment that said the Defendant is without right or authority to

threaten or to maintain suit against Plaintiff for alleged infringement of the

mark and generic English word "trump".

(b) Entry of judgment that Plaintiff's use of the at-issue domains is in compliance with the ACPA.

(c) Entry of judgment that the Defendant's claim to trademark "trump" is invalid, unenforceable, and void in law in the United States; and that said Mark is not infringed by Plaintiff because of the making or using of the at-issue domains.

(d) Entry of judgment that the Plaintiff is entitled to the use of the at-issue domains and for suspension of the WIPO Judgment ordering transfer of the domain names to the Defendant.

(e) Entry of judgment for Plaintiff's costs and reasonable attorney advisory fees incurred herein.

(f) For such other and further relief as the Court may deem appropriate.

Dated: March 22ⁿᵈ, 2011

J. Taikwok Yung of Web-adviso

556 E88th St.

Brooklyn, NY 11236

Telephone:     (646) 309-8421

Fax:          (484) 251-5115

E-Mail:        sporting202@yahoo.com

8

Case 14-1554, Document 52, 07/20/2015, 1561696, Page67 of 129

JS 44 (Rev. 12/07)  ~~ORIGINAL~~ CIVIL COVER SHEET         *March 22, 2011*

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| J. Taikwok Yung, 556 East 88th Street, Brooklyn, NY 11236 Phone Number: (646)-309-8421 | Donald J. Trump |

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Pro Se: See Above

Attorney's (If Known)

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | **IMMIGRATION** | | ☐ 900Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 463 Habeas Corpus - Alien Detainee | | |
| | | | ☐ 465 Other Immigration Actions | | |

**V. ORIGIN** (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
Brief description of cause:
Civil Action Pursuant To "28 USC 1331"

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ _____
CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY**
(See instructions): JUDGE **RANDOM/RANDOM**  DOCKET NUMBER **NONE**

DATE 03/22/2011                SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE *DLI*  MAG. JUDGE *VVP*

*1413*

App.9

## ARBITRATION CERTIFICATION

I, _____, counsel for _____ do hereby certify pursuant to the Local Arbitration Rule 83.10 that to the best of my knowledge and belief the damages recoverable in the above captioned civil action exceed the sum of $150,000 exclusive of interest and costs. _____ Relief other than monetary damages is sought.

## DISCLOSURE STATEMENT - FEDERAL RULES CIVIL PROCEDURE 7.1

Identify any parent corporation and any publicly held corporation that owns 10% or more or its stocks:

## RELATED CASE STATEMENT (SECTION VIII)

**All cases that are arguably related pursuant to Division of Business Rule 50.3.1 should be listed in Section VIII on the front of this form. Rule 50.3.1 (a) provides that "A civil case is "related" to another civil case for purposes of this guideline when, because of the similarity of facts and legal issues or because the cases arise from the same transactions or events, a substantial saving of judicial resources is likely to result from assigning both cases to the same judge and magistrate judge."**

### NY-E DIVISION OF BUSINESS RULE 50.1(d)(2)

1.) Is the civil action being filed in the Eastern District removed from a New York State Court located in Nassau or Suffolk County:     NO

2.) If you answered "no" above:

    a) Did the events or omissions giving rise to the claim or claims, or a substantial part thereof, occur in Nassau or Suffolk County?     NO

    b) Did the events of omissions giving rise to the claim or claims, or a substantial part thereof, occur in the Eastern District?     YES

If your answer to question 2 (b) is "No", does the defendant (or a majority of the defendants, if there is more than one) reside in Nassau or Suffolk County; or, in an interpleader action, does the claimant (or a majority of the claimants, if there is more than one) reside in Nassau or Suffolk County? _____

    (Note: A corporation shall be considered a resident of the County in which it has the most significant contacts).

### BAR ADMISSION

I am currently admitted in the Eastern District of New York and currently a member in good standing of the bar of this court.

Yes _____     No _____

Are you currently the subject of any disciplinary action (s) in this or any other state or federal court?

Yes _____ (If yes, please explain)     No _____

_____

_____

Please provide your E-MAIL address and bar code below. Your bar code consists of the initials of your first and last name and the last four digits of your social security number or any other four digit number registered by the attorney with the Clerk of Court. (This information must be provided pursuant to local rule 11.1(b) of the civil rules).

**Attorney Bar Code:** _____

**E-MAIL Address:** _____

Electronic filing procedures were adopted by the Court in Administrative Order No. 97-12, "In re: Electronic Filing Procedures (ECF)." Electronic filing became mandatory in Administrative Order 2004-08, "In re: Electronic Case Filing." Electronic service of all papers is now routine.

I certify the accuracy of all information provided above.

**Signature:** _____

James D. Weinberger (*jweinberger@frosszelnick.com*)
Todd Martin (*tmartin@frosszelnick.com*)
Leo Kittay (*lkittay@frosszelnick.com*)
FROSS ZELNICK LEHRMAN & ZISSU, P.C.
866 United Nations Plaza
New York, NY 10017
Tel:  (212) 813-5900
Fax:  (212) 813-5901

*Counsel for Defendant/Counterclaim-Plaintiff*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| WEB-ADVISO and J. TAIKWOK YUNG, | |
| Plaintiffs, | |
| v. | CV 11-1413 (DLI) (VVP) |
| DONALD J. TRUMP, | ANSWER AND COUNTERCLAIM |
| Defendant. | |
| DONALD J. TRUMP, | |
| Counterclaim-Plaintiff, | |
| v. | |
| WEB-ADVISO and J. TAIKWOK YUNG, | |
| Counterclaim-Defendants. | |

Defendant/Counterclaim-Plaintiff Donald J. Trump, by his undersigned attorneys Fross

Zelnick Lehrman & Zissu, P.C. for his Answer and Counterclaim herein, alleges:

**ANSWER**

1.        Lacks knowledge or information sufficient to form a belief as to the truth of the

allegations of paragraph 1 of the Complaint, except admits that the World Intellectual Property

Organization's Arbitration and Mediation Center (the "WIPO Panel") determined that the

{F0789842.3 }

domain names trumpbudhabi.com, trumpbeijing.com, trumpindia.com and trumpmumbai.com (collectively, the "Infringing Domain Names") are confusingly similar Defendant's well-known and registered TRUMP mark and ordered Plaintiff to transfer the Infringing Domain Names to Defendant.

2. Lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 2 of the Complaint.

3. Lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 3 of the Complaint, except admits that Plaintiff unlawfully registered the Infringing Domain Names on September 20, 2007 and November 27, 2007.

4. Denies the allegations of paragraph 4 of the Complaint and states that Defendant is a world-renowned entrepreneur, celebrity and builder and developer of luxury residential real estate.

## JURISDICTION AND VENUE

5. Lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 5 of the Complaint.

6. Lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 6 of the Complaint.

## FACTS

7. Admits the allegations of Paragraph 7 of the Complaint.

8. Denies the allegations of paragraph 8 of the Complaint.

9. Admits the allegations of Paragraph 9 of the Complaint and avers further that in its complaint to the WIPO Panel, Defendant also alleged that Plaintiff has no rights in and to the TRUMP mark and no legitimate interest in the Infringing Domain Names.

10.     Admits the allegations of Paragraph 10 of the Complaint and avers further that the WIPO Panel determined that: (i) the Infringing Domain Names are confusingly similar to Defendant's registered and well-known TRUMP mark, (ii) Plaintiff has no legitimate rights or interests in the Infringing Domain Names, (iii) Plaintiff's opportunistic and intentional registration of the Infringing Domain Names to capitalize on Defendant's fame constituted bad faith registration, and (iv) as a result of such determinations, transfer of the Infringing Domain Names was warranted.

11.     Denies the allegations of paragraph 11 of the Complaint.

12.     Denies the allegations of paragraph 12 of the Complaint.

13.     Lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 13 of the Complaint.

14.     Lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 14 of the Complaint.

15.     Denies the allegations of paragraph 15 of the Complaint.

16.     Lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 16 of the Complaint.

17.     Repeats and realleges paragraphs 1 to 17 above as though fully set forth herein.

18.     Denies the allegations of paragraph 18 of the Complaint.

19.     Denies the allegations of paragraph 19 of the Complaint.

20.     Repeats and realleges paragraphs 1 to 20 above as though fully set forth herein.

21.     Denies the allegations of paragraph 21 of the Complaint.

22.     Denies the allegations of paragraph 22 of the Complaint.

23.     Denies the allegations of paragraph 23 of the Complaint.

## FIRST DEFENSE: FAILURE TO STATE A CLAIM

24.     The Complaint fails to state a claim upon which relief can be granted.

## **COUNTERCLAIM**

1.     This is an action for cyberpiracy, trademark infringement, unfair competition, trademark dilution under applicable federal and state law.   Counterclaim-Plaintiff Donald J. Trump ("Counterclaim-Plaintiff" or "Trump"), one of the most recognizable people in the world, seeks to prevent the unlawful use of his world-famous TRUMP brand and trademark by admitted "domainers," Counterclaim-Defendants Web-adviso and J. Taikwok Yung.  Indeed, a panel of the World Intellectual Property Organization's Arbitration and Mediation Center has already determined that Counterclaim-Defendants' use and registration of the domain names trumpabudhabi.com, trumpbeijing.com, trumpindia.com and trumpmumbai.com was in bad faith and in violation of Trump's rights, *see* Exhibit **A**.  Rather than abide by that decision, Counterclaim-Defendants have instead, without any justifiable legal basis, appealed to this Court seeking a declaratory judgment of non-infringement, forcing Trump to assert these counterclaims against them.  In order to recover the domain names which have already been ordered to be returned to him as well as protect his valuable trademark rights, Trump by this counterclaim seeks injunctive relief, damages, attorney's fees and any other available remedies against Counterclaim-Defendants under applicable law.

## JURISDICTION AND VENUE

2.     This action arises under the Trademark Act of 1946, as amended (the "Lanham Act"), 15 U.S.C. § 1051 *et seq.*, and applicable state and common law.

3.     The Court has original jurisdiction over the subject matter of this action pursuant to Section 39 of the Lanham Act, 15 U.S.C. § 1121, and under Sections 1331 and 1338(a) and (b) of the Judicial Code, 28 U.S.C. §§1331, 1338(a) & (b).  The Court has supplemental

jurisdiction over Counterclaim-Plaintiff's state law claims under Section 1367(a) of the Judicial

Code, 28 U.S.C. § 1367(a).

   4.      This Court has personal jurisdiction over Counterclaim-Defendants because they

reside in and/or do business in this district and because the transactions giving rise to this lawsuit

occurred in this district.

   5.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1400.

PARTIES

   6.      Counterclaim-Plaintiff is Donald J. Trump, an individual residing in New York,

New York, with an office at 725 Fifth Avenue, New York, New York 10022.

   7.      Upon information and belief, Counterclaim-Defendant Web-adviso ("Web-

adviso") is an unincorporated business and defendant and J. Taikwok Yung ("Yung") is an

individual both of which are located at 556 E. 88th Street, Brooklyn, New York 11236 (Web-

adviso and Yung are collectively referred to herein as "Counterclaim-Defendants").

FACTS COMMON TO ALL CLAIMS

**A.    Counterclaim-Plaintiff and the TRUMP Mark**

   8.      Counterclaim-Plaintiff is one of the most well known real estate developers,

hoteliers, authors and television personalities in the world.  His portfolio includes residential real

estate, commercial real estate, golf courses, casinos, hotels, and other properties, spread across

the United States and around the world.  Among the iconic properties owned, operated or

affiliated with Counterclaim-Plaintiff are the Trump Tower on Fifth Avenue, The Trump

Building at 40 Wall Street, Trump World Tower at the United Nations Plaza, Trump Park

Avenue at 59th Street and Park Avenue, Trump Parc and Trump Parc East at Central Park South,

Trump Place on the Hudson River, and Trump Palace. Counterclaim-Plaintiff also is associated

with several casinos, including three in Atlantic City, New Jersey: Trump Taj Mahal, Trump Plaza and Trump Marina.

9.      Counterclaim-Plaintiff is an accomplished and best selling author. Counterclaim-Plaintiff has had numerous best sellers including *The Art of the Deal*, which is considered a business classic, *The Art of the Comeback*, *The America We Deserve*, *How To Get Rich*, *Think Like a Billionaire*, *Trump 101*, *Why We Want You To Be Rich*, *Think Big*, *Never Give Up* and *Think Like a Champion*.

10.     Counterclaim-Plaintiff is also the star and executive producer of the NBC television shows *The Apprentice* and *The Celebrity Apprentice*. These two shows have aired for a combined 11 seasons and have been among the most popular televisions shows broadcast in the United States since the premiere of the franchise in 2004.

11.     Counterclaim-Plaintiff has also, for many years, offered a wide range of goods and services under his TRUMP mark, including but not limited to clothing, accessories, golf courses and clubs, food and beverages, restaurants, home furnishings and periodicals.

12.     Through the widespread, extensive use of the TRUMP trademark in connection with his various businesses and the expenditure of large sums in promoting the TRUMP brand on television, in print advertisements, on the Internet and in other media, Counterclaim-Plaintiff's TRUMP mark has become uniquely associated with Counterclaim-Plaintiff and his goods and services, and has attained considerable fame and widespread acclaim in the United States. As a result, Counterclaim-Plaintiff's TRUMP marks represent enormous goodwill.

13.     In addition to the extensive use of the TRUMP mark, Counterclaim-Plaintiff is the owner of numerous trademark registrations for such mark in connection with his hotels, real estate and related goods and services. For example, Counterclaim-Plaintiff owns the following U.S. federal trademark registrations for the TRUMP mark:

| Reg. No. | Reg. Date | First Use Date | Goods/Services |
|---|---|---|---|
| 2,240,310 | April 20, 1999 | June 12, 1995 | hotel services |
| 2,413,984 | December 19, 2000 | July 1999 | spring water |
| 2,431,539 | February 27, 2001 | December 1997 | golf club services |
| 3,391,095 | March 4, 2008 | January 8, 2004 | entertainment services, namely, ongoing unscripted television programs in the field of business, business disputes, and dispute resolution |
| 3,456,507 | July 1, 2008 | October 6, 2006 | vodka |
| 3,526,411 | November 4, 2008 | February 28, 1985 | real estate services, namely, listing, leasing, financing, and managing commercial, residential, and hotel properties; real estate development and construction of commercial, residential, and hotel properties |
| 3,655,340 | July 14, 2009 | December 2007 | general feature magazines. |
| 3,483,760 | August 12, 2008 | November 2003 | restaurant services. |
| 3,563,198 | January 20, 2009 | 1975 | chairs, couches, loveseats, and ottomans |
| 3,687,022 | September 22, 2009 | March 3, 2005 | dress shirts |
| 3,245,415 | May 22, 2007 | May 6, 2005 | watches |
| 3,321,143 | October 23, 2007 | July 6, 2006 | toy model cars, namely, die-cast cars and radio control cars |

14.    In 2007, Counterclaim-Plaintiff's son Donald Trump, Jr., an Executive Vice President with The Trump Organization, announced plans to build TRUMP-branded hotels and

{F0789842.3 }

7

luxury condominiums in Mumbai and Bangalore, India.  News reports of his visit to India in advance of that project were published as early as July 2, 2007.

**B.      Counterclaim-Defendants and Their Bad Faith
        Registration and Use of the Infringing Domain Names**

15.      Web-adviso is a self-styled "domainer," a web development group that looks to acquire high-value domain names and park them with domain parking service providers (*e.g.*, GoDaddy) to generate and maintain Internet traffic with pay-per-click revenue services while the website is under construction.

16.      Shortly after Trump's 2007 development announcements, Web-adviso registered the domain names trumpabudhabi.com, trumpbeijing.com, trumpindia.com and trumpmumbai.com (collectively, the "Infringing Domain Names"), and placed nearly identical websites thereon (the "Infringing Websites").

17.      While Counterclaim-Defendants have styled the Infringing Websites as "news" and "parody" sites, none of the content posted was developed by or for Counterclaim-Defendants.  Rather, the Infringing Websites contain links to random and scattered third party videos about Counterclaim-Plaintiff.  Upon information and belief, the creators of the third-party videos have no known connection to or affiliation with Counterclaim-Defendants, and their use is likely without authorization in violation of the U.S. Copyright Act, 17 U.S.C. § 101 *et seq.* Similarly, the information contained in the "RE News" sections of each of the Infringing Websites is nothing more than news feeds from Google News generated by the keywords, "real estate." There is no original "news" content authored by Counterclaim-Defendants at any of the Infringing Websites.

18.      Upon information and belief, Counterclaim-Defendants registered the Infringing Domain Names to capitalize on Counterclaim-Plaintiff's fame and notoriety and to sell each of

the Infringing Domain Names to Counterclaim-Plaintiff at a profit. As stated by Web-adviso's

representative John Yung, in an email to Counterclaim-Plaintiff's counsel on November 8, 2010:

> Webadviso agrees to negotiate with your organization in hopes of reaching
> a more mutually agreeable terms. Under the advisement from numerous
> internet professionals and legal sources, Webadviso believes the domain
> names, the large internet traffic from the site, and the development
> programming labor/work that has gone into building the site have
> significant value. We hope that your organization recognizes these
> attributes in your effort to negotiate with Webadviso. (sic)

*See* Exhibit **B**.

19.    As per his usual practice of offering to acquire infringing domain names at cost in

order to avoid unnecessary legal action, Counterclaim-Plaintiff offered to pay Web-adviso $100

to cover the transfer and registration costs for the Infringing Domain Names, but this offer was

rejected by Web-adviso's representative William Ng on November 4, 2010. *See* Exhibit **C**. By

rejecting Counterclaim-Plaintiff's reasonable offer to pay the registration and transfer costs

associated with the Infringing Domain Names and then requesting greater compensation for the

domains, Counterclaim-Defendants made clear that they sought to unfairly profit from their

improper registration of the Infringing Domain Names.

**C.    Counterclaim-Plaintiff's Successful Uniform Domain Name
      Dispute Resolution Proceeding Against Defendant Web-adviso**

20.    Counterclaim-Plaintiff on December 17, 2010 commenced a Uniform Domain

Name Dispute Resolution Proceeding ("UDRP") against Web-adviso to recover the Infringing

Domain names by filing a complaint for mandatory arbitration before an arbitration panel of the

World Intellectual Property Organization (the "WIPO Panel"), alleging that the Infringing

Domain Names were registered and being used in bad faith.

21.    Pursuant to UDRP rules, the WIPO Panel commenced the proceeding on

December 22, 2010.

22.     On January 17, 2011, Web-adviso, in a submission signed by Yung, opposed the

UDRP on the following stated bases:

- The term "trump" is generic;

- Counterclaim-Plaintiff did not, at the time the Infringing Domain Names were
  registered, own trademark registrations for TRUMPMUMBAI,
  TRUMPMUMBAI.COM, TRUMPABUDHABI, TRUMPABUDHABI.COM,
  TRUMPBEIJING, TRUMPBEIJING.COM, TRUMPINDIA, or
  TRUMPINDIA.COM;

- The Infringing Websites were legitimate parody/satire "fanworks";

- Counterclaim-Plaintiff's reliance on his plans to build properties in Mumbai and
  Bangalore, India was "absurd";

- Counterclaim-Plaintiff's characterization of the negotiations to purchase the
  Infringing Domain Names was misleading, though it admitted rejecting offers to
  sell such names at cost;

- The Infringing Websites were not confusing to consumers;

- The content on the Infringing Websites made them "legitimate"; and

- The Infringing Domain Names were not registered and used in bad faith.

*See* Exhibit A at 4-6.

23.     In a decision dated March 5, 2011, the WIPO Panel rejected Counterclaim-

Defendants' contentions described above and determined that: (i) the Infringing Domain Names

registered by Web-adviso were identical or confusingly similar to Counterclaim-Plaintiff's

TRUMP marks; (ii) Web-adviso had no rights or legitimate interests in respect of the Infringing

Domain Names; and (iii) the Infringing Domain Names had been registered and are being used

in bad faith. *See* Exhibit A at 6-9. Detailed findings supporting these holding were provided,

based on the evidence and arguments submitted by the parties. The WIPO Panel thus ordered

the prompt transfer of the Infringing Domain Names to Trump. *Id.*

24.    To avoid the transfer of the Infringing Domain Names that was mandated by the WIPO Panel, Counterclaim-Defendants initiated this action, depriving the WIPO Panel of its ability to effect its order and transfer the Infringing Domain Names to Trump.

25.    Counterclaim-Defendants are not strangers to the courts.    Shortly after the announcement in 2008 that Bank of America was acquiring brokerage firm Merrill Lynch, Counterclaim-Defendants registered several domain names featuring various combinations of Bank of America and Merrill Lynch indicia.  In an action before the Honorable Judge Denny Chin, then of the U.S. District Court for the Southern District of New York, captioned *Web-adviso & J. Taikwok Yung v. Bank of America Corp. & Merrill Lynch Corp.*, Case No. 09-cv-05769-DC (S.D.N.Y.), Counterclaim-Defendants sought declaratory relief of non-infringement and a finding that their actions did not constitute cybersquatting.  Bank of America and Merrill Lynch counterclaimed for trademark infringement, unfair competition, dilution and cybersquatting (essentially the same claims asserted by Counterclaim-Plaintiff in this action). Following entry of a preliminary injunction and summary judgment against Counterclaim-Defendants, on April 21, 2010 the Court (a) dismissed the complaint for declaratory relief, (b) determined that Counterclaim-Defendants had committed trademark infringement, unfair competition, dilution and cybersquatting, (c) ordered the transfer of the domain names in question and (d) enjoined Counterclaim-Defendants from violating the rights of Bank of America and Merrill Lynch.  Counterclaim-Defendants appealed the judgment to the U.S. Court of Appeals for the Second Circuit, Appeal Nos. 10-292, 10-130, which such appeals are currently pending.

## FIRST CLAIM FOR RELIEF – FEDERAL
## TRADEMARK INFRINGEMENT (15 U.S.C. § 1114(1))

26.    Counterclaim-Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 25 as if fully set forth herein.

27.     Counterclaim-Defendants' operation of the Infringing Websites is likely to cause confusion, mistake or deception as to the source or sponsorship of Counterclaim-Defendants' services.

28.     As a result of Counterclaim-Defendants' unauthorized use of Counterclaim-Plaintiff's federally registered TRMIMP marks, the public is likely to believe that Counterclaim-Defendants' services are affiliated with and/or approved by Counterclaim-Plaintiff, and such use falsely represents Counterclaim-Defendants as being legitimately connected with and/or authorized by Counterclaim-Plaintiff and places beyond Counterclaim-Plaintiff's control his own reputation and ability to control the use of his TRUMP mark or the quality of the goods and services bearing that mark.

29.     Counterclaim-Defendants' infringement of Counterclaim-Plaintiff's registered marks is willful, intended to reap the benefit of the goodwill of Counterclaim-Plaintiff, and violates Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

30.     Counterclaim-Defendants' aforesaid conduct is causing immediate and irreparable injury to Counterclaim-Plaintiff and to his goodwill and reputation, and will continue both to damage Counterclaim-Plaintiff and deceive and threaten harm to the public unless permanently enjoined by this Court. Counterclaim-Plaintiff has no adequate remedy at law.

SECOND CLAIM FOR RELIEF – FEDERAL
<u>UNFAIR COMPETITION (15 U.S.C. § 1125(a))</u>

31.     Counterclaim-Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 30 above as if fully set forth herein.

32.     Counterclaim-Defendants' use of TRUMP for services that are identical, related and/or substantially similar to those produced by Counterclaim-Plaintiff under the TRUMP marks constitutes a false designation of origin and a false representation as to the origin of Counterclaim-Defendants' websites. Counterclaim-Defendants' use of TRUMP is likely to

cause confusion, mistake, or deception as to the source of Counterclaim-Defendants' services and is likely to create the false impression that the services are authorized, sponsored, endorsed, licensed by, or affiliated with Counterclaim-Plaintiff.   Counterclaim-Defendants' actions constitute unfair competition in violation of Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

33.   Counterclaim-Defendants' conduct is willful, intended to reap the benefit of the goodwill of Counterclaim-Plaintiff, and violates Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

34.   Counterclaim-Defendants' conduct has caused and is causing immediate and irreparable injury to Counterclaim-Plaintiff and will continue both to damage Counterclaim-Plaintiff and deceive the public unless enjoined by this Court.  Counterclaim-Plaintiff has no adequate remedy at law.

## THIRD CLAIM FOR RELIEF –
### FEDERAL DILUTION (15 U.S.C. § 1125(c))

35.   Counterclaim-Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 34 above as if fully set forth herein.

36.   Counterclaim-Defendants' use of Counterclaim-Plaintiff's famous TRUMP trademark in connection with services is likely to cause dilution by blurring and/or tarnishment by diminishing the ability of the TRUMP mark to identify goods and services in violation of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c).

37.   Counterclaim-Defendants' conduct has caused and is causing immediate and irreparable injury to Counterclaim-Plaintiff and will continue both to damage Counterclaim-Plaintiff and deceive the public unless enjoined by this Court.  Counterclaim-Plaintiff has no adequate remedy at law.

## FOURTH CLAIM FOR RELIEF – VIOLATION OF ANTI-
### CYBERSQUATTING CONSUMER PROTECTION ACT (15 U.S.C. § 1125(d))

38.     Counterclaim-Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 37 above as if fully set forth herein.

39.     Counterclaim-Plaintiff's TRUMP mark was distinctive and famous at the time of the registration of the Infringing Domain Names.

40.     Without authorization from Counterclaim-Plaintiff, Counterclaim-Defendants have registered, trafficked in, and/or used the domain names Infringing Domain Names, each of which is confusingly similar to Counterclaim-Plaintiff's federally registered TRUMP mark.

41.     Upon information and belief, Counterclaim-Defendants had full knowledge of Counterclaim-Plaintiff's prior rights in the famous TRUMP mark when they secured registrations for the Infringing Domain Names.

42.     Counterclaim-Defendants have registered, trafficked in, and/or used the Infringing Domain Names with the bad faith intent to profit from the TRUMP mark. Upon information and belief, the Infringing Domain Names have been used by Counterclaim-Defendants with the bad faith intent to reap the benefit of the goodwill in the TRUMP mark, to divert consumers to the Infringing Websites for their own commercial gain and to otherwise profit from unauthorized use of the TRUMP mark.

43.     The aforesaid acts and conduct constitute cyberpiracy in violation of the Anticybersquatting Consumer Protection Act, Section 43(d) of the Lanham Act, 15 U.S.C. § 1125(d).

44.     The unauthorized registration and use of the Infringing Domain Names is causing immediate and irreparable injury to Counterclaim-Plaintiff and to the goodwill and reputation of the TRUMP mark, and will continue to damage Counterclaim-Plaintiff and the TRUMP mark

unless the Court enjoins such use and transfers registration of the Infringing Domain Names to Counterclaim-Plaintiff.

### FIFTH CLAIM FOR RELIEF – UNFAIR
### COMPETITION UNDER NEW YORK COMMON LAW

45.    Counterclaim-Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 44 above as if fully set forth herein.

46.    Counterclaim-Defendants' use of TRUMP is likely to confuse the public as to the origin, source or sponsorship of Counterclaim-Defendants' services, or to cause mistake or to deceive the public into believing that Counterclaim-Defendants' services are authorized, sponsored, endorsed, licensed by, or affiliated with Counterclaim-Plaintiff, in violation of Counterclaim-Plaintiff's rights in the TRUMP mark under the common law of the State of New York.

47.    Upon information and belief, Counterclaim-Defendants chose TRUMP with full knowledge of Counterclaim-Plaintiff's prior use of and rights in TRUMP.  By adopting and using a colorable imitation of TRUMP, Counterclaim-Defendants have been unjustly enriched and Counterclaim-Plaintiff has been damaged.

48.    By misappropriating and trading upon the goodwill and business reputation represented by the TRUMP mark, Counterclaim-Defendants have been and, unless enjoined by this Court, will continue to be unjustly enriched at Counterclaim-Plaintiff's expense.

49.    Counterclaim-Defendants' use of a trademark identical to the TRUMP mark in connection with the Infringing Websites constitutes unfair competition under New York common law.

50.    Counterclaim-Defendants' conduct has caused and is causing immediate and irreparable injury to Counterclaim-Plaintiff and will continue to both damage Counterclaim-

Plaintiff and deceive the public unless enjoined by this Court.  Counterclaim-Plaintiff has no

adequate remedy at law.

## SIXTH CLAIM FOR RELIEF – VIOLATION
## OF THE NEW YORK DECEPTIVE AND UNFAIR
## TRADE PRACTICES ACT (N.Y. General Business Law § 349)

51.     Counterclaim-Plaintiff repeats and realleges the allegations set forth in paragraphs

1 through 50 above as if fully set forth herein.

52.     By reason of the acts set forth above, Counterclaim-Defendants have been and are

engaged in deceptive acts or practices in the conduct of a business, trade or commerce in

violation of Section 349 of the New York General Business Law.

53.     Counterclaim-Defendants' use of TRUMP in connection with the Infringing

Websites has the capacity to deceive and is deceiving the public as to the source or sponsorship

of Counterclaim-Defendants' services.  As a result, the public will be damaged.

54.     Counterclaim-Defendants' conduct is willful and in knowing disregard of

Counterclaim-Plaintiff's rights.

55.     Counterclaim-Defendants' conduct constitutes a deceptive trade practice under

Section 349 of the General Business Law of the State of New York.

56.     Counterclaim-Defendants' conduct has caused and is causing immediate and

irreparable injury to Counterclaim-Plaintiff and will continue to both damage Counterclaim-

Plaintiff and deceive the public unless enjoined by this Court.  Counterclaim-Plaintiff has no

adequate remedy at law.

## SEVENTH CLAIM FOR RELIEF – TRADEMARK
## DILUTION UNDER NEW YORK LAW (N.Y. General Business Law § 360-*l*)

57.     Counterclaim-Plaintiff repeats and realleges the allegations set forth in paragraphs

1 through 56 above as if fully set forth herein.

58. Counterclaim-Plaintiff's TRUMP mark is distinctive and it acquired distinctiveness prior to Counterclaim-Defendants' first use of TRUMP in connection with the Infringing Websites.

59. Counterclaim-Defendants' unauthorized use of TRUMP, which is a colorable imitation of Counterclaim-Plaintiff's distinctive TRUMP mark, is diluting and is likely to continue diluting such mark by blurring the distinctiveness of and/or tarnishing the mark, and is likely to injure and has injured Counterclaim-Plaintiff's business reputation and damage Counterclaim-Plaintiff, in that the reputation of Counterclaim-Plaintiff has been removed from his power and control in violation of Section 360-*l* of the General Business Law of the State of New York.

60. Counterclaim-Defendants' unauthorized acts as described herein have caused and will continue to cause irreparable damage to Counterclaim-Plaintiff's business and goodwill unless enjoined by this Court. Counterclaim-Plaintiff has no adequate remedy at law.

WHEREFORE, Counterclaim-Plaintiff respectfully demands judgment as follows:

1. Directing that Counterclaim-Defendants transfer the Infringing Domain Names to Trump or his authorized representative.

2. That a permanent injunction be issued enjoining Counterclaim-Defendants, jointly and severally, their officers, agents, directors, shareholders, principals, licensees, distributors, attorneys, servants, employees, affiliates, subsidiaries and assigns, and all those persons in concert or participation with any of them from:

 a. imitating, copying, or making unauthorized use of the TRUMP mark

 b. importing, manufacturing, producing, distributing, circulating, selling, offering for sale, advertising, promoting or displaying any product bearing any simulation, reproduction, counterfeit, copy, or colorable imitation of the

TRUMP mark or any other indicia associated with Trump;

c.     using any simulation, reproduction, counterfeit, copy or colorable imitation of the trump mark in connection with the importation, promotion, advertisement, display, sale, offering for sale, manufacture, production, circulation or distribution of any product in such fashion as to relate or connect, or tend to relate or connect, such product in any way to Trump or to any goods sold, manufactured, sponsored or approved by or connected with Trump;

d.     using any false designation of origin or false description or statement, or performing any act which is likely to lead members of the trade or public to believe that any product manufactured, distributed or sold by Counterclaim-Defendants is in any manner associated or connected with Trump, or is sold, manufactured, licensed, sponsored, approved or authorized by Trump;

e.     transferring, consigning, selling, shipping or otherwise moving any goods, packaging or other materials in Counterclaim-Defendants' possession, custody or control bearing a mark or other indicia substantially identical to Trump's TRUMP mark;

f.     engaging in any other activity constituting unfair competition with Trump, or constituting an infringement of his TRUMP mark;

g.     applying to register or registering in the United States Patent and Trademark Office or in any state trademark registry any mark consisting in whole or in part of the term "TRUMP" or consisting in whole or in part of any simulation, reproduction, copy or colorable imitation of the

TRUMP mark;

h.    diluting or tarnishing Trump's TRUMP mark;

i.    registering anywhere in the world, asking any third party to register on their behalf, or assisting any third party in registering or maintaining any domain name, subdomain name, URL, e-mail address, or other electronic identifier that includes, in whole or in part, the term "TRUMP" or any formative thereof (including misspellings);

j.    owning, renting, purchasing or otherwise obtaining rights to any internet search term that includes in whole or in part the term "TRUMP" or any formative thereof (including misspellings) for purposes of directing internet traffic to any web site;

k.    disposing, destroying, altering, moving, removing, concealing, tampering with or in any manner secreting any business records (including computer records) of any kind, including invoices, correspondence, receipts or other documentation relating or referring in any manner to the manufacture, advertising, receiving, acquisition, importation, purchase, sale or offer for sale, or distribution of any merchandise offered, distributed or sold under the TRUMP mark;

l.    assisting, aiding or abetting any other person or business entity in engaging in or performing any of the activities referred to in subparagraphs (a) through (k) above.

3.    Directing that Counterclaim-Defendants deliver up to Trump's attorneys for destruction all products, labels, signs, stationery, prints, packages, promotional and marketing materials, advertisements and other materials (a) currently in their possession or under their

control or (b) recalled by Counterclaim-Defendants pursuant to any order of the Court or

otherwise, incorporating, featuring or bearing TRUMP or any other simulation, reproduction,

copy or colorable imitation of the TRUMP mark.

      4.     Directing such other relief as the Court may deem appropriate to prevent the

public from deriving the erroneous impression that any service advertised, promoted, distributed,

displayed, produced, sold or offered for sale by Counterclaim-Defendants is in any manner

authorized by Trump or related in any way to Trump.

      5.     Directing that Counterclaim-Defendants file with the Court and serve upon

Trump's counsel within thirty (30) days after entry of judgment a report in writing under oath,

setting forth in detail the manner and form in which they have complied with the above.

      6.     Awarding Trump such damages he has sustained or will sustain by reason of

Counterclaim-Defendants' acts of cybersquatting, trademark infringement, dilution and unfair

competition and that such sums be trebled pursuant to 15 U.S.C. § 1117, including but not

limited to, at Trump's election prior to final judgment, an award of statutory damages for

Counterclaim-Defendant's violation of section 43(d) of the Lanham Act, 15 U.S.C. § 1125(d).

      7.     Awarding Trump all gains, profits, property and advantages derived by

Counterclaim-Defendants from their unlawful conduct.

      8.     Awarding to Trump exemplary and punitive damages to deter any further willful

infringement as the Court finds appropriate.

      9.     Awarding to Trump his costs and disbursements incurred in this action, including

reasonable attorneys' fees pursuant to 15 U.S.C. §1117(a).

      10.     Awarding Trump interest, including pre-judgment interest on the foregoing sums.

11.    Awarding to Trump such other and further relief as the Court may deem just and

proper.

Dated: May 6, 2011                              FROSS ZELNICK LEHRMAN & ZISSU, P.C.
       New York, New York

By:

James D. Weinberger (*jweinberger@frosszelnick.com*)
Todd Martin (*tmartin@frosszelnick.com*)
Leo Kittay (*lkittay@frosszelnick.com*)
866 United Nations Plaza
New York, NY 10017
Tel: (212) 813-5900
Fax: (212) 813-5901

*Counsel for Defendant/Counterclaim Plaintiff*

App.32

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
WEB-ADVISO, J. TAIKWOK YUNG, *pro se*,

              Plaintiff-Counterclaim
              Defendant,

        -against-

DONALD J. TRUMP,

              Defendant-Counterclaim
              Plaintiff.

------------------------------------------------------------x

**OPINION AND ORDER**
11-cv-1413 (DLI) (VVP)

**DORA L. IRIZARRY, U.S. District Judge:**

    *Pro se* plaintiff-counterclaim defendant J. Taikwok Yung, who purportedly does business under the name Web-adviso ("Plaintiff"),[1] brought this action against defendant-counterclaim plaintiff Donald J. Trump ("Defendant") seeking a declaration that he is entitled to use the internet domain names trumpabudhabi.com, trumpbeijing.com, trumpindia.com and trumpmumbai.com (collectively, the "Domain Names"), because his use of the Domain Names does not infringe on any of Defendant's trademark rights or violate the Anti-Cybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d). (*See* Compl., Dkt. Entry 1, ¶¶ 2, 17-23.) Defendant brought counterclaims against Plaintiff for: 1) federal trademark infringement; 2) federal unfair competition; 3) federal trademark dilution; 4) violation of the ACPA; 5) New York State law unfair competition; 6) violation of New York State Deceptive and Unfair Trade Practices Act; and 7) New York State law trademark dilution. (*See* Counterclaim, Dkt. Entry 4, ¶¶ 26-60.)

----

[1] It does not appear that Web-Adviso is an entity with a separate legal existence from Yung. Therefore, the court uses the term Plaintiff to refer to Yung personally and Yung as his d/b/a, Web-Adviso, interchangeably.

App.32

Dockets.Justia.com

Defendant moved for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on Plaintiff's declaratory judgment claims and Defendant's counterclaims for federal and state trademark infringement, federal and state unfair competition and violation of the ACPA. (*See* Mem. in Supp. of Def.'s Mot. for Partial Summ. J., Dkt. Entry 39 ("Def.'s Mem."), at 1.) Plaintiff opposed the motion. (*See* Pl.'s Aff. in Opp'n to Def.'s Mot. for Partial Summ. J., Dkt. Entry 44 ("Pl.'s Opp'n").) For the following reasons, Defendant's motion is granted with respect to the ACPA claim and denied as moot as to all other claims.

## BACKGROUND

Plaintiff is a self-described "domainer," which he defines as somebody who "acquire[s] interesting and high value domain names and park[s] them initially with domain parking service providers and/or build[s] the website, if feasible, with interesting content which takes significant time to program, customize and debug the back-end codes." (Pl.'s Opp'n ¶ 27.) Plaintiff explains that getting "high quality" domain names means "getting domain names that make sense, easy to remember, concise in spelling and convey a knowledge of quality of the internet in its name." (*Id.*) Besides the Domain Names, Plaintiff owns almost 200 other domain names, many of which contain names of well-known businesses, such as barclayscapitallehman.com, citigroupwachovia.com, goldmansachsgroup.com, hulufriend.com, milanvogue.com, silversurfergame.com and xbox360sdk.com. (Decl. of James D. Weinberger in Supp. of Def.'s Mot. for Partial Summ. J, Dkt. Entry 41 ("Weinberger Decl."), Ex. 9.)

Defendant is, among other things, a real estate developer and hotelier. (*See* Decl. of Eric F. Trump in Supp. of Def.'s Mot. for Partial Summ. J., Dkt. Entry 40 ("Trump Decl."), ¶ 9.) He has authored several books and hosts the nationally broadcast television shows *The Apprentice* and *The Celebrity Apprentice.* (*Id.* ¶¶ 12-13; Compl. ¶ 4.) In connection with his business

2

interests, Defendant has registered his last name in capital letters, "TRUMP," as a trademark with the United States Patent and Trademark Organization ("USPTO"). (*See* Trump Decl. Ex. 1.) He has used this mark, personally and through a privately held business entity, The Trump Organization, to promote myriad goods and properties, including residential buildings, hotels, golf courses, clothing and home furnishings. (*See id.* ¶¶ 4-5, 10.) Defendant also has affirmed to the USPTO that he has used the TRUMP mark continuously for five years or more in connection with hotel services, bottled water and golf course services. (*See* Weinberger Decl. Ex. 1.)

Defendant also holds various domain names that he uses to promote his "brand." (Trump Decl. ¶ 17.) While the "main website" for The Trump Organization is located at trump.com, Defendant also holds domain names with the word "trump" followed by a geographic location, which promote "TRUMP-branded" real estate projects in the location indicated by the domain name. (*Id.* ¶¶ 17-19.) These domain names include trumpchicago.com, trumphollywood.com and trumpistanbul.com.tr, promoting real estate bearing the TRUMP mark in Chicago, Illinois, Hollywood, Florida, and Istanbul, Turkey, respectively. (*Id.* ¶ 19.)

In 2007, Defendant's son, who is an Executive Vice President of the Trump Organization, announced plans to build TRUMP-branded hotels and condominiums in Mumbai and Bangalore, India. (*Id.* ¶ 21 & Ex. 4.) Subsequently, in September and November 2007, Plaintiff registered the Domain Names, trumpbeijing.com, trumpindia.com, trumpmumbai.com and trumpabudhabi.com. (Pl.'s Opp'n ¶ 16.) Plaintiff states that the websites are not run for profit and host political and non-political commentary, satire and "shared complaints of the poor quality ultra-low budget reality TV show 'The Apprentice.'" (*Id.* ¶¶ 5, 17.) The websites contain disclaimers that they are not affiliated with Defendant, such as: "The content and this website has [sic] NOT been approved by Donald Trump, or by the Trump Organization, or by

3

the shows 'The Apprentice'/'The Celebrity Apprentice.'" (*Id.* ¶ 6 & Ex. C.)

On October 27, 2010, an attorney representing the Trump Organization wrote a letter to Plaintiff asserting that his use of trumpmumbai.com and trumpindia.com violated Defendant's common law and federal trademark rights, and subjected Plaintiff to liability under the ACPA. (Trump Decl. Ex. 5.) The letter threatened Plaintiff with litigation if he did not transfer the domain names to Defendant. (*Id.*) By e-mail dated November 4, 2010, Plaintiff declined to comply with Defendant's demands, but consented to negotiate "in the hope of reaching a more mutually beneficial agreement." (*Id.* Ex. 6.) The same day, counsel for the Trump Organization offered to pay $100 for trumpmumbai.com and trumpindia.com to cover "reasonable" transfer and registration costs incurred by Plaintiff. (*Id.* Ex. 7.) On November 8, 2010, Plaintiff replied that he "agrees to negotiate with your organization in hopes of reaching a more mutually agreeable terms [sic] . . . . [Plaintiff] believes the domain names, the large internet traffic from the site, and the development programming labor/work that has gone into building the site have significant value." (*Id.* Ex. 8.)

On December 17, 2010, Defendant brought an arbitration proceeding against Plaintiff before the World Intellectual Property Organization pursuant to the Uniform Domain Name Resolution Policy ("UDRP"), asserting that the Domain Names infringed on the TRUMP mark. (Weinberger Decl. Ex. 4, ¶ 50.) Plaintiff opposed Defendant's claims. (*See id.* Ex. 5.) On March 5, 2011, the arbitrator ruled in favor of Defendant, and directed that Plaintiff transfer the Domain Names to Defendant. (*Id.* Ex. 6 at 9.) In a written decision, the arbitrator found that the Domain Names were confusingly similar to the TRUMP trademark, Plaintiff had no legitimate interest in the Domain Names, and Plaintiff had registered and used the Domain Names in bad

faith. [2] (*Id*. at 6-9.)

On March 22, 2011, Plaintiff filed the instant action seeking a declaration that he is entitled to use the Domain Names because they do not infringe on Defendant's trademarks or violate the ACPA. (*See* Compl. ¶¶ 2, 17-23.) Defendant brought counterclaims against Plaintiff for: 1) federal trademark infringement pursuant to Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1); 2) federal unfair competition pursuant to Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); 3) federal dilution pursuant to Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c); 4) violation of the ACPA; 5) unfair competition under New York State common law; 6) violation of New York State Deceptive and Unfair Trade Practices Act pursuant to Section 349 of the New York State General Business Law; and 7) New York State law trademark dilution under Section 360-*l* of the New York State General Business Law. (*See* Counterclaim ¶¶ 26-60.)

Defendant moved for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on both of Plaintiff's declaratory judgment claims and Defendant's counterclaims for federal and state trademark infringement, federal and state unfair competition and violation of the ACPA. (*See* Def.'s Mem. 1.) Defendant contends that there is no genuine issue of material fact that: 1) he has a protectable right in the TRUMP mark; 2) Plaintiff's use of the mark is likely to cause confusion; and 3) Plaintiff is a "cybersquatter" under the ACPA. (*See id*.) Plaintiff opposed the motion, contending that: 1) the word "trump" is generic; 2) Plaintiff

---

[2] The parties have not addressed the implications of the UDRP proceeding on this action, but it appears that it has no precedential value. As one court in this circuit has explained: "[t]he UDRP process has been described as 'adjudication lite' because the proceedings are handled entirely upon written submissions and the arbitration panel has total discretion to determine the application of precedent and rules of evidence. The UDRP decisions are not binding on the courts." *Gen. Media Comm'ns, Inc. v. Crazy Troll, LLC*, 2007 WL 102988, at *4 (S.D.N.Y. Jan. 16, 2007) (internal citation omitted).

does not run the websites at issue for profit and has not tried to sell the Domain Names; 3) the websites do not cause confusion because they contain disclaimers explaining that they are not affiliated with Defendant; 4) the First Amendment to the United States Constitution and the ACPA's safe harbor provision entitles Plaintiff to maintain the allegedly infringing websites because they are used for parody and commentary; and 5) Defendant's claims are barred by the doctrine of laches. (*See generally* Pl.'s Opp'n.)

## LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view all facts in the light most favorable to the nonmoving party, but "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id*. A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The nonmoving party, however, may not rely on "[c]onclusory allegations, conjecture, and speculation." *Kerzer v. Kingly Mfg.*, 156 F. 3d 396, 400 (2d Cir. 1998). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F. 3d 1219, 1224 (2d Cir. 1994) (citing *Dister v. Cont'l Grp., Inc.*, 859 F. 2d 1108, 1114 (2d Cir. 1988)).

In addition, the court holds *pro se* pleadings to "to less stringent standards than formal

pleadings drafted by lawyers." *Hughes v. Rowe*, 449 U.S. 5, 9 (1980). The court construes them "to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F. 3d 471, 474 (2d Cir. 2006) (per curiam) (emphasis omitted).

## DISCUSSION

### I. Anti-Cybersquatting Consumer Protection Act

The ACPA was enacted to protect consumers and holders of distinctive trademarks from "cybersquatting," which "involves the registration as domain names of well-known trademarks by non-trademark holders who then try to sell the names back to the trademark owners." *Sporty's Farm L.L.C. v. Sportsman's Mkt., Inc.*, 202 F. 3d 489, 493 (2d Cir. 2000). The ACPA imposes civil liability on a person who, "without regard to the goods or services of the parties":

> (i) has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and
>
> (ii) registers, traffics in, or uses a domain name that –
>
>> (I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark; [or]
>>
>> (II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark.

15 U.S.C. § 1125(d)(1)(A). Thus, Defendant must show that: (1) the TRUMP mark is either distinctive or famous; (2) the Domain Names are identical or confusingly similar to the TRUMP mark; and (3) Plaintiff had a bad faith intent to profit from use of the mark. *See Sporty's Farm L.L.C.*, 202 F. 3d at 497-99.

### A. "Distinctive" or "Famous"

Under the ACPA, the court "must first determine whether [the mark at issue] is a distinctive or famous mark and thus entitled to the ACPA's protection." *Id.* at 497. There is no

7

genuine issue of material fact that the TRUMP mark is distinctive and entitled to the ACPA's protection.[3] Prior to Plaintiff registering the Domain Names in 2007, Defendant attested to the USPTO that the TRUMP mark was incontestable when used in hotel services, bottled water and golf club services, because Defendant had registered and continuously used the mark in connection with these goods and services for at least five years. (*See* Weinberger Decl. Ex. 1; *see also* Trump Decl. Ex. 1.) The USPTO accepted and acknowledged Defendant's attestation. (*See* Weinberger Decl. Ex. 1.) This serves as "conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark" in connection with hotel services, bottled water and golf club services, subject to certain exceptions enumerated in the Lanham Act. 15 U.S.C. § 1115(b). It also entitles Defendant "to a presumption that its registered trademark is inherently distinctive." *Sporty's Farm L.L.C.*, 202 F. 3d at 497 (quoting *Equine Techs., Inc. v. Equitechnology, Inc.*, 68 F. 3d 542, 545 (1st Cir. 1995)). Thus, Plaintiff cannot argue that the TRUMP mark lacks secondary meaning. *See Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 191, 203 (1985) (action to enjoin the infringement of an incontestable mark cannot be defended on grounds that mark is descriptive and lacks secondary meaning).

Reading his submissions liberally, Plaintiff attempts to rebut the presumption of distinctiveness by asserting that the word "trump" is not entitled to protection because it is a generic "dictionary word" that means "any playing card of a suit that for the time outranks other suits, such a card being able to take any card of another suit." (Pl.'s Opp'n ¶ 5; Compl. ¶ 21.)

---

[3] Because it is distinctive, the court need not decide whether the TRUMP mark is also famous. *See Prime Publishers, Inc. v. American-Republican, Inc.*, 160 F. Supp. 2d 266, 277 (D. Conn. 2001) ("In contrast to the Federal Trademark Dilution Act ('FTDA'), 15 U.S.C. § 1125(c), which protects marks that are both famous and distinctive from dilution, a mark needs only one of those qualities to merit protection under the ACPA.").

8

This argument is meritless.

Under the Lanham Act, "no incontestable right shall be acquired in a mark which is the generic name *for the goods or services or a portion thereof, for which it is registered*." 15 U.S.C. § 1065(4) (emphasis added). In other words, a term is only generic to the extent that it "name[s] the species or object to which the mark applies." *Nabisco, Inc. v. PF Brands, Inc.*, 191 F. 3d 208, 215 (2d Cir. 1999), *abrogated on other grounds, Moseley v. Secret Catalogue, Inc.*, 537 U.S. 418 (2003). However, an otherwise generic term can become non-generic, and entitled to protection, when used in connection with goods or services unrelated to its generic meaning. *See* J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition*, § 12:1 (4th ed.) ("Certainly, a term can be a generic name of one thing but be a valid trademark for some *other* product. For example: APPLE is a generic name for the edible fruit of the apple tree, but is a trademark for computers." (footnote omitted)). When an otherwise generic term is used as a trademark for a good or service that bears little or no relationship to its ordinary generic meaning, it becomes "arbitrary and fanciful," and thus is inherently distinctive. *See Virgin Enters. Ltd. v. Nawab*, 335 F. 3d 141, 148-49 (2d Cir. 2003) ("In relation to the sale of consumer electronic equipment, the VIRGIN mark is inherently distinctive, in that it is arbitrary and fanciful; the word 'virgin' has no intrinsic relationship whatsoever to selling such equipment."); *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F. 2d 1072, 1075-76 (2d Cir. 1993) ("An arbitrary term is one that has a dictionary meaning – though not describing the product – like IVORY for soap."); *Omega S.A. v. Omega Eng'g, Inc.*, 228 F. Supp. 2d 112, 123 (D. Conn. 2002) ("The Court has no doubt that the marks 'omega' and 'O', as used in connection with the manufacture and sale of watches, clocks, and electronic timing equipment, are inherently distinctive. The meanings associated with the word 'omega' and letter 'O' do not suggest time

9

or watches.").

Here, the generic dictionary definition of trump is unrelated to any good or service for which the TRUMP mark is used by Defendant. The word "trump" is defined in the dictionary as, *inter alia*, "all the cards of a suit . . . that if legally played will win over a card that is not of this suit" and "to get the better of." *Webster's Third New International Dictionary (Unabridged)*, 2455 (1993). There is no intrinsic connection between these generic definitions and hotel services, bottled water or golf course services, for which the TRUMP mark has become incontestable. These dictionary definitions also bear no relation to the other goods and products for which the TRUMP mark has been registered, but has not yet become incontestable, such as real estate services, vodka, magazines, restaurant services and furniture. (*See* Trump Decl. Ex. 1.) The TRUMP mark is arbitrary in these contexts because it is derived from Defendant's last name, not from any colloquial use relating to card games or getting the better of somebody. (*See* Trump Decl. ¶ 14.) Thus, its generic meaning in unrelated settings does not undermine its strength or validity here.

Accordingly, as a matter of law, the TRUMP mark is distinctive when used in connection with Defendant's businesses.

### B.    Identical or Confusingly Similar

The court next must consider whether the Domain Names are "identical or confusingly similar to" the TRUMP mark. 15 U.S.C. § 1125(d)(1)(A)(ii)(I). The Domain Names, trumpbeijing, trumpindia, trumpmumbai and trumpabudhabi,[4] are not identical to the TRUMP mark because of the geographic terms following the word trump, so the court looks at whether

---

[4] "When evaluating whether a domain name is confusingly similar to a trademark, a district court disregards the top-level domain name (e.g. '.com', '.org', '.net' etc.)." *Omega S.A.*, 228 F. Supp. 2d at 126 n.36.

there are any genuine material factual issues as to whether the Domain Names and the mark are confusingly similar. In determining whether the Domain Names are confusingly similar to the TRUMP mark within the meaning of the ACPA, the court compares "solely [Defendant's] marks and [Plaintiff's] domain names, including their intrinsic sound, sight, and meaning, without reference to goods or services with which the domain name is associated by the parties' use." *Omega S.A.*, 228 F. Supp. 2d at 127.

A comparison reveals that no reasonable juror could conclude that the Domain Names are not confusingly similar to the TRUMP mark. The similarities are instantly apparent because of the inclusion of the word "trump" in the Domain Names, and Plaintiff does not argue that the "trump" in the Domain Names reference anything other than Defendant's last name. The differences between the Domain Names and the TRUMP mark lie in the geographic terms in the Domain Names. However, names of places, such as Beijing or India, are similar to the types of common words that other courts have held do not distinguish a domain name from a mark. *See, e.g., id.* at 127 ("[T]he Court concludes . . . that the domain names 'OMEGATIME' and 'OMEGAWATCH' are confusingly similar to the marks 'omega' or 'O'."); *Mattel, Inc. v. Adventure Apparel*, 2001 WL 1035140, at *2 (S.D.N.Y. Sept. 7, 2001) ("The similarities between 'barbiesbeachwear.com', 'barbiesclothing.com' and the BARBIE trademark are apparent on their face."); *Prime Publishers, Inc.*, 160 F. Supp. 2d at 280 ("We do not believe the Defendant's addition of a generic or geographic term such as 'ct' is sufficient to distinguish the domain name from Plaintiff's protected mark."). The place names actually add confusion in this instance. The Domain Names' inclusion of geographic terms mimics many of the domain names Defendant uses to promote TRUMP-branded properties in specific places, such as trumpchicago.com, trumphollywood.com, trumptoronto.ca and trumpwaikiki.com. (*See* Trump

Decl. ¶ 19.) As a result, the inclusion of "mumbai" in trumpmumbai.com, for example, rather than distinguishing the domain name from the TRUMP mark, makes it appear to the unsuspecting internet user that the website is promoting a property in Mumbai, India, associated with Defendant.

Plaintiff asserts that the Domain Names could not cause any confusion because the websites contain disclaimers, such as: "The content and this website has [sic] NOT been approved by Donald Trump, or by the Trump Organization, or by the shows 'The Apprentice'/'The Celebrity Apprentice.'" (Pl.'s Opp'n ¶ 6.) Plaintiff's contention misses the mark. The relevant inquiry is whether the Domain Names are confusingly similar to the TRUMP mark, not whether the actual websites accessed using the Domain Names cause confusion or compete with Defendant's business. Under the ACPA, "any similarities or distinctions between the products themselves, *i.e.*, whether or not the content of [Plaintiff's] website might compete with [Defendant's] product, are irrelevant." *Prime Publishers, Inc.*, 160 F. Supp. 2d at 279; *see also* 15 U.S.C. § 1125(d)(1)(A) (liability attaches under the ACPA "without regard to the goods or services of the parties"). "It is irrelevant under the ACPA that confusion about a Web site's source or sponsorship could be resolved by visiting the Web site identified by the accused domain name." McCarthy, *supra*, § 25:78 (citing *Coca-Cola Co. v. Purdy*, 382 F. 3d 774 (8th Cir. 2004)).

Congress designed the ACPA to prevent "individuals seeking extortionate profits by reserving Internet domain names that are similar or identical to trademarked names with no intention of using the names in commerce themselves." H.R. Rep. No. 106-412, at 6 (1999). In drafting the ACPA, Congress also found that cybersquatters hurt businesses, because "consumers seeking a trademark owner's Web site are diverted elsewhere, which means lost business

12

opportunities for the trademark owner." *Id.* at 6. These wrongs would hardly be prevented if individuals could register domain names similar or identical to protectable marks, so long as there is a disclaimer somewhere on the website itself. Owners of trademarks still would face extortionate demands for money from individuals looking to profit off of the goodwill associated with the mark and businesses would be robbed of domain names where potential customers could easily find their products and services. *Cf. Savin Corp. v. Savin Grp.*, 391 F. 3d 439, 458 n.12 (2d Cir. 2004) ("A significant purpose of a domain name is to identify the entity that owns the [website]. Customers searching for a company's website will often search using a domain name identical or similar to the company's name or mark . . . . Customers unable to locate [a plaintiff's] website using domain names identical to its marks, . . . may fail to continue to search for [the plaintiff's] own home page, due to anger, frustration, or the belief that [the plaintiff's] home page does not exist." (quoting *Pinehurst, Inc. v. Wick*, 256 F. Supp. 2d 424, 431 (M.D.N.C. 2003)) (alterations in original)).

Accordingly, there is no genuine issue of material fact that Defendant has satisfied the "confusingly similar" prong of his ACPA claim.

### C.    Bad Faith

The court next turns to whether Plaintiff "has a bad faith intent to profit from" the TRUMP mark. 15 U.S.C. § 1125(d)(1)(A)(i). The statute provides nine factors to assist courts in determining whether a party has a bad faith profit motive. These nine factors are:

> (I) the trademark or other intellectual property rights of the person, if any, in the domain name;
>
> (II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;
>
> (III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

(IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

(V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c) of this section.

*Id.* § 1125(d)(1)(B)(i). The Second Circuit has stressed that courts "are not limited to considering just the listed factors when making [a] determination of whether the statutory criterion has been met. The factors are, instead, expressly described as indicia that 'may' be considered along with other facts." *Sporty's Farm L.L.C.*, 202 F. 3d at 498.

The court finds that the evidence of Plaintiff's bad faith here is overwhelming. This conclusion ineluctably follows from the nine statutory factors, as well as the holdings by both the district court and the Second Circuit in a previous ACPA action involving Plaintiff. That case, *Webadviso v. Bank of America Corp.*, is materially identical to the instant matter. In *Webadviso*,

14

Plaintiff registered the domain names bofaml.com and mlbofa.com on the same day that Bank of America Corporation ("Bank of America") and Merrill Lynch & Co., Inc. ("Merrill Lynch") announced their merger. *Webadviso v. Bank of Am. Corp.*, 2009 WL 5177997, at *2 (S.D.N.Y. Dec. 31, 2009). An arbitrator found that the domain names were confusingly similar to Bank of America's and Merrill Lynch's trademarks and that Plaintiff had no legitimate right to bofaml.com and mlbofa.com. *Id.* at *3. Plaintiff subsequently filed an action in the Southern District of New York seeking a declaration that he did not violate the ACPA and Bank of America and Merrill Lynch brought counterclaims under federal and state law. *Id.* at *1. In granting a preliminary injunction preventing Plaintiff's use of the domain names and then granting summary judgment in favor of Bank of America and Merrill Lynch, then-District Judge Denny Chin of the Southern District of New York held that Plaintiff acted in bad faith because: 1) Plaintiff never had previously used any iterations of "bofa" or "ml" in his business; 2) despite Plaintiff's assertions that he has never sold a domain name, the record shows that he is a "domainer" who "seeks to register domain names incorporating well-known marks with the hope that he can sell the domain names back to the trademark owners;" 3) Plaintiff had registered approximately 180 domain names, some of which included well-known trademarks; 4) Plaintiff registered bofaml.com and mlbofa.com the same day the media reported the Bank of America-Merrill Lynch merger; and 5) an arbitrator found that the domain names at issue were confusingly similar to Bank of America's and Merrill Lynch's trademarks and that Plaintiff registered the domain names in bad faith. *Id.* at *4-5; *Webadviso v. Bank of Am. Corp.*, 2010 WL 521117, at *1-3 (S.D.N.Y. Feb. 16, 2010).

The Second Circuit summarily affirmed Judge Chin's grant of summary judgment, holding that bad faith was shown because:

15

> By Yung's own admission, he seeks to acquire high value domain names and park them with domain parking service providers to generate pay-per-click revenue. By doing so in this case, Yung ran afoul of the ACPA, for whether or not he had any intention of selling the domain names to appellees, he clearly had the intention to profit from the goodwill associated with the trademarks that comprised the domain names. His business model relied upon diverting internet users (presumably, among others, those who were attempting to access the websites of Bank of America and Merrill Lynch) to his own website – which contained content that could tarnish the infringed marks, or at the very least was not what the searchers sought to find – in order to profit from the "pay-per-click revenue" that their increased web traffic would bring his site.

*Webadviso v. Bank of Am. Corp.*, 448 F. App'x 95, 98 (2d Cir. 2011) (internal citation and quotation marks omitted). The court further explained that summary judgment also was supported by the fact that Plaintiff "had registered some 180 domain names, many of which were composed, in whole or in part, of famous trademarks." *Id.* at 98 n.3.

Summary judgment is warranted here for virtually the same reasons described by Judge Chin and the Second Circuit in *Webadviso*. There is no evidence that Plaintiff has any intellectual property rights in the Domain Names. *See* 15 U.S.C. § 1125(d)(1)(A)(i)(I). He has never done business using the word "trump" or the word trump followed by geographic names. *See id.* § 1125(d)(1)(A)(i)(III). The Domain Names are wholly unrelated to Plaintiff's name or the name of his business, Webadviso. *See id.* § 1125(d)(1)(A)(i)(II). Plaintiff's assertions that he has never tried to sell a domain name to Defendant or any other third-party and that he does not seek to profit from the Domain Names is belied, as the Second Circuit found in *Webadviso*, by admissions elsewhere that he seeks to acquire "interesting and high value domain names and park them initially with domain parking service providers and/or build the website, if feasible, with interesting content." (Compl. ¶ 3; *see also* Trump Decl. Ex. 8 (letter by Plaintiff informing Defendant that trumpmumbai.com and trumpindia.com have "significant value").)

Moreover, Plaintiff states that he registers "high value" domain names, but the only

reason that can be gleaned from the record why the Domain Names have any value is because they use the TRUMP mark and easily could be confused with Defendant's legitimate websites. (Pl.'s Opp'n ¶ 27.) As discussed above, the Domain Names parrot Defendant's practice of using the TRUMP mark followed by geographic terms to promote specific properties. (*See supra* § I.B.) In addition, Plaintiff registered trumpmumbai.com and trumpindia.com shortly after reports in the media surfaced that TRUMP-branded hotel and condominium projects were being developed in Mumbai and Bangalore, India. (*See* Trump Decl. ¶ 21 & Ex. 4.)

In response to these uncontroverted facts, Plaintiff has failed to provide any explanation of why he included geographic terms, such as Mumbai and Abu Dhabi. Indeed, the websites located at the Domain Names have no apparent connection to those places. As a result, the only logical conclusion is that the Domain Names were purposefully designed to confuse internet users into thinking that the Domain Names are used by Defendant to promote his business. *See* 15 U.S.C. § 1125(d)(1)(A)(i)(V). Such calculated exploitation of the goodwill associated with another's trademark is precisely the sort of bad faith the ACPA is designed to combat. *See Vogster Entm't, L.L.C. v. Mostovoy*, 2009 WL 691215, at *3 (E.D.N.Y. Mar. 16, 2009) (The ACPA was intended to prevent "the bad faith, abusive registration and use of the distinctive trademarks of others as internet domain names, with the intent to profit from the goodwill associated with those trademarks.").

As Judge Chin and the Second Circuit also held, Plaintiff's bad faith is further demonstrated by the fact that he owns almost two hundred other domain names, many of which are obvious appropriations well-known brands. *Webadviso*, 448 F. App'x at 98 n.3; *Webadviso*, 2010 WL 521117, at *1 ("Webadviso has a history of registering domain names that include well-known trademarks. . . ."). For example, besides mlbofa.com and bofaml.com, Plaintiff has

17

previously registered barclayscapitallehman.com, citigroupwachovia.com, goldmansachsgroup.com, hulufriend.com, milanvogue.com and xbox360sdk.com, which only have apparent value because they incorporate the names of businesses or goods. (*See* Weinberger Decl. Ex. 9.) These other domain names provide further undisputed evidence that Plaintiff has violated the ACPA in this instance. *See* 15 U.S.C. § 1125(d)(1)(A)(i)(VIII).

In sum, on this record, the conclusion that Plaintiff is a cybersquatter is unavoidable. At a minimum, applying the uncontested evidence to statutory factors I, II, III, V and VIII conclusively shows Plaintiff's bad faith in registering the Domain Names, while nothing shows Plaintiff's good faith. Therefore, there is no genuine issue of material fact that Defendant has established his burden under the bad faith prong of the ACPA.

**D.      Fair Use and First Amendment Defenses**

Plaintiff asserts that, notwithstanding any other evidence showing bad faith, Defendant is not entitled to summary judgment because the Domain Names are protected by the "fair use" doctrine and the First Amendment. (*See* Pl.'s Opp'n ¶¶ 19-25.) The ACPA has a "safe harbor" for parties who would otherwise be subject to the liability under the ACPA. The statute provides that bad faith "shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." 15 U.S.C. § 1125(d)(1)(B)(ii). While the Second Circuit has not construed the limits of the safe harbor, notably, courts in other circuits have cautioned that "courts should 'make use of this "reasonable belief" defense very sparingly and only in the most unusual cases.'" *Lahoti v. VeriCheck, Inc.*, 586 F. 3d 1190, 1203 (9th Cir. 2009) (quoting *Audi AG v. D'Amato*, 469 F .3d 534, 549 (6th Cir. 2006)). "Otherwise, the defense would 'undermine the rest of the statute' because '[a]ll but the most blatant cybersquatters will be able to put forth at

least some lawful motives for their behavior.'" *Id.* (quoting *Virtual Works, Inc. v. Volkswagen of Am., Inc.*, 238 F. 3d 264, 270 (4th Cir. 2001) (alterations in original)).

"Fair use" or "otherwise lawful" use are not expressly defined in the ACPA, but, elsewhere in the Lanham Act, use of another's trademark is permitted in connection with a description, parody, criticism, commentary and news reporting. *See* 15 U.S.C. § 1125(c)(3) (dilution context); 15 U.S.C. § 1115(b)(4) (infringement context); *see also TCPIP Holding Co., Inc. v. Haar Commc'ns, Inc.*, 244 F. 3d 88, 103 (2d Cir. 2001) (Describing fair use in infringement context as "one party's exclusive right to use a mark will not prevent others from using the word or image constituting the mark in good faith in its descriptive sense, and not as a trademark." (internal quotation marks and alteration omitted)). In this instance, it appears that Congress intended to protect similar uses of trademarks from liability under the the ACPA. *See* H.R. Rep. No. 106-412, at 11 (fair use factor balances interests of trademark holder with interests of those who make "non-commercial or fair uses of others' marks online, such as in comparative advertising, comment, criticism, parody, news reporting, etc."). Thus, the court must consider whether Plaintiff had a good faith basis in believing that he was using the TRUMP mark as a description, parody, criticism or commentary.

The court holds that Plaintiff did not have any reasonable grounds to believe that his use of the Domain Names is a fair use or otherwise lawful. As an initial matter, the scant news, commentary and criticism on the websites provide little evidence that Plaintiff registered the Domain Names in good faith. The record reflects that Plaintiff has put in minimal resources in developing the websites. Plaintiff has stated that there are no operating expenses in connection with the websites. (*See* Weinberger Decl. Ex. 2 (Interrogatory Resp. 14).) The websites located at the Domain Names, all of which are identical, do not contain any material posted after 2011.

*See* www.trumpmumbai.com (last visited Jan. 15, 2013); www.trumpabudhabi.com (last visited Jan. 15, 2013); www.trumpbeijing.com (last visited Jan. 15, 2013); www.trumpindia.com (last visited Jan. 15, 2013). The content relating to Defendant consists almost entirely of materials taken from third parties, such as videos parodying Defendant that he found on YouTube, generic lawyer jokes with "lawyer" replaced by "Apprentice," and off-color jokes about alcoholics with terms for alcoholics substituted with "Apprentice." (*See id.*; Weinberger Decl. Ex. 2 (Interrogatory Resp. No. 15).) The only apparently original commentary relating to Defendant is a chart listing ten seasons of Defendant's television shows, *The Apprentice* and *The Celebrity Apprentice*, containing columns listing the shows' declining ratings and short commentary such as "OK season" and "What kind cheap [sic] low budget show is this?"

Otherwise, the site contains various content unrelated to Defendant under headings that seem to be lifted from the ACPA's safe harbor provision. For example, under a "News" heading, there is a list of real estate headlines automatically generated by a Google News feed. The "Political Commentary" section consists largely of off-color jokes about former-Congressman Anthony Weiner posted in 2011. In sum, the websites give the appearance that they were haphazardly put together as an attempt to post minimal content under each category traditionally associated with fair use (e.g., news, politics, criticism) in an attempt to benefit from the ACPA's safe harbor. If Plaintiff's conduct were deemed to fall under the safe harbor simply because he has put up websites with token content ostensibly covered by the fair use doctrine, the safe harbor exception would swallow the rule.

Moreover, even if the websites' contents are the result of a bona fide attempt to create news and commentary sites, Plaintiff's conduct does not fall within the ACPA's safe harbor. As a leading treatise has explained, the safe harbor "is not intended to create a loophole that could

20

'swallow' the Act by allowing a domain name holder to evade liability merely by putting up a seemingly innocent site under an infringing domain name." McCarthy, *supra*, § 25:78; *see also Coca-Cola Co.*, 382 F. 3d at 786-88 (defendant barred by the ACPA from using domain names incorporating trademarks to drive internet traffic to anti-abortion websites.) The Domain Names themselves do not provide commentary or criticism about Defendant or his businesses. They also give no indication that they are addresses for websites that are forums for criticizing Defendant, rather than websites operated by Defendant. *Cf.* McCarthy, *supra*, § 25:76 ("Those who are unhappy with a company may open a web-site complaining and criticizing the company (a 'gripe site'), using a domain name that makes it clear what kind of a Web site it is. The typical example is the use of a company trademark followed by '-sucks,' as in 'www.generalmotorssucks.com.'").

The Domain Names merely contain the TRUMP mark followed by geographic names that have nothing to do with commentary, criticism or any content on the websites. As discussed *supra* § I.B, they mimic domain names Defendant uses to promote his businesses, a tactic Plaintiff has employed with various other well-known trademarks even after court findings that such conduct violates the ACPA. *See Coca-Cola Co.*, 382 F. 3d at 788 ("Given the extensive evidence of bad faith in the record, we conclude that Purdy lacked reasonable grounds to believe that his conduct was lawful, and he is not entitled to benefit from the safe harbor provision."). Thus, the use of TRUMP in the Domain Names is not a fair use and there is no evidence that Plaintiff had any good faith reason to believe otherwise.

For similar reasons, Plaintiff's assertion that Defendant's ACPA claim is barred by the First Amendment fails as a matter of law. The Second Circuit has explained that "[d]omain names . . . *per se* are neither automatically entitled to nor excluded from the protections of the

First Amendment, and the appropriate inquiry is one that fully addresses particular circumstances presented with respect to each domain name." *Name.Space, Inc. v. Network Solutions, Inc.*, 202 F. 3d 573, 586 (2d Cir. 2000). The extent of the First Amendment's protection is based upon whether the domain names are communicative or appear to identify the source of the communication. *Id.* at 585-86; *see also OBH, Inc. v. Spotlight Magazine, Inc.*, 86 F. Supp. 2d 176, 198 (W.D.N.Y. 2000) ("Defendants offer no argument as to why the Court should determine that their use of 'thebuffalonews.com' is a communicative message rather than a source identifier."). This is consistent with the well settled principle that "the First Amendment confers a measure of protection for the unauthorized use of trademarks when that use is a part of the expression of a communicative message." *Yankee Publ'g Inc. v. News Am. Publ'g Inc.*, 809 F. Supp. 267, 275 (S.D.N.Y. 1992). However, "[w]hen another's trademark (or a confusingly similar mark) is used without permission *for the purpose of source identification*, the trademark law generally prevails over the First Amendment." *Id.* at 276.

For example, a court in the Southern District of New York, summarily affirmed by the Second Circuit, granted Planned Parenthood's preliminary injunction motion to stop a defendant's use of plannedparenthood.com for a website selling anti-abortion books because the domain name likely infringed on Planned Parenthood's trademark. *See Planned Parenthood Fed'n of Am., Inc. v. Bucci*, 1997 WL 133313 (S.D.N.Y. Mar. 24, 1997), *summ. aff'd*, 152 F. 3d 920 (2d Cir. 1998) (table decision). The court rejected the defendant's assertion that his use of the domain name was protected by the First Amendment, holding that the domain name plannedparenthood.com was not part of any communicative message against abortion, but was more akin to a source identifier. *Id.* at *10.

Similarly, here, the Domain Names are not communicative and Plaintiff's use of them is

not protected by the First Amendment. The Domain Names provide no commentary or criticism of Defendant or any other topic. The Domain Names appear to identify Defendant, or an authorized user of the TRUMP mark, as the source of the websites, likely to promote Defendant's business interests in the locations indicated in the Domain Names. As explained by the court in *Planned Parenthood*, such misidentification of a website's source is not entitled to First Amendment protection. In coming to this conclusion, the court emphasizes that it is not questioning Plaintiff's First Amendment rights to comment upon and criticize Defendant and his businesses. However, he may not do so by using Defendant's mark to confuse people into visiting his websites. "The First Amendment protects an individual's right to speak out against a markholder, but it does not permit an individual to suggest that the markholder is the one speaking." *SMJ Grp., Inc. v. 417 Lafayette Rest. LLC*, 439 F. Supp. 2d 281, 291 (S.D.N.Y. 2006).

Accordingly, there is no genuine issue of material fact that Plaintiff's registration and use of the Domain Names runs afoul of the ACPA. Defendant is entitled to judgment in his favor on his ACPA claim as well as Plaintiff's ACPA declaratory judgment claim.[5]

## II.    Laches

Plaintiff contends that Defendant's claims to the Domain Names are barred by laches. Plaintiff registered the Domain Names in September and November 2007 and Defendant first demanded Plaintiff transfer the Domain Names in October 2010. (*See* Pl.'s Opp'n ¶¶ 15-18.)

---

[5] The court denies Defendant's motion for summary judgment as moot with respect to his federal and state trademark infringement and federal and state unfair competition counterclaims because of the court's holding that Defendant is entitled to relief under the ACPA. For the same reason, the court dismisses as moot Plaintiff's claim seeking a declaration that the Domain Names do not infringe on Defendant's trademark. *See Webadviso*, 448 F. App'x at 98 n.4 ("We do not address the appellant's arguments regarding the non-ACPA claims, as the relief granted to the appellees was available upon the District Court's grant of judgment for the appellees on the ACPA claim.").

23

Plaintiff asserts that Defendant's approximately three-year delay in asserting his rights to the Domain Names was unreasonable and prejudiced Plaintiff. (*See id.*)

As a threshold matter, Plaintiff's laches defense fails because he intentionally exploited Defendant's trademark. The Second Circuit has held in the Lanham Act infringement context that "[i]t is well established that 'laches is not a defense against injunctive relief when the defendant intended the infringement.'" *Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F. 3d 104, 107 (2d Cir. 2000) (quoting *Harlequin Enters. Ltd. v. Gulf & W. Corp.*, 644 F. 2d 946, 950 (2d Cir. 1981)). While the court is unaware of any Second Circuit decision addressing whether this principal applies to ACPA claims, the court perceives no reason why it is not equally valid in the ACPA context. The ACPA is an amendment to the Lanham Act and addresses a similar wrong (the unauthorized use of another's trademark to confuse the public). *See Mashantucket Pequot Tribe v. Redican*, 403 F. Supp. 2d 184, 198 (D. Conn. 2005) ("[T]he ACPA is an amendment to the Lanham Act. Moreover, the goals of the ACPA, like the rest of the Lanham Act, would appear to include protection against public confusion.")

Furthermore, "[t]his good-faith component of the laches doctrine is part of the fundamental principle that 'he who comes into equity must come with clean hands.'" *Hermes Int'l*, 219 F. 3d at 107 (quoting *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945)). A party with unclean hands is equally unsuited to benefit from the equitable doctrine of laches in an infringement claim for injunctive relief as it is in an ACPA claim for injunctive relief, since they are the same equitable remedies for similar wrongs. In this instance, Plaintiff does not come to the court with clean hands. As discussed above, Plaintiff registered the Domain Names in bad faith as part of a scheme to capitalize on the goodwill of another's trademarks. Thus, his intentional bad faith use of Defendant's trademark prevents him

24

from benefiting from laches as a matter of law.

Even if the laches defense was available to Plaintiff, there is no genuine issue of material fact that he cannot establish such a defense. "A party asserting the defense of laches must establish that: (1) the plaintiff knew of the defendant's misconduct; (2) the plaintiff inexcusably delayed in taking action; and (3) the defendant was prejudiced by the delay." *Ikelionwu v. United States*, 150 F. 3d 233, 237 (2d Cir. 1998). A party is prejudiced when it has "changed his position in a way that would not have occurred if the plaintiff had not delayed." *Conopco, Inc. v. Campbell Soup Co.*, 95 F. 3d 187, 192 (2d Cir. 1996).

Other than general speculation that a sophisticated party such as Defendant must have known about the Domain Names before October 2010, when his attorney sent a letter demanding that Plaintiff transfer the Domain Names, Plaintiff has not put forward any evidence that Defendant previously knew about the Domain Names. There also is no evidence that Plaintiff was prejudiced by the three-year delay. Plaintiff asserts that he has renewed the Domain Names' registrations three times and has built "significant traffic and content" at the websites at issue. (Pl.'s Opp'n ¶ 17.) Yet, Plaintiff has not explained what effort or money was expended in re-registering the Domain Names three times. Plaintiff also fails to make any showing that he has built traffic to the websites or has expended meaningful resources on developing the websites. As discussed *supra* § I.D, the websites feature little content, almost all of which is taken from third parties, and has not been updated since 2011. Plaintiff also has stated that he has no expenses from operating any of the websites. (*See* Weinberger Ex. 2 (Interrogatory Resp. No. 14).) Thus, there is no factual basis for Plaintiff's assertion that he has been prejudiced by the three-year delay between his registration of the Domain Names and the October 2010 letter from Defendant's attorney.

25

App.57

Accordingly, Plaintiff's laches defense fails as a matter of law.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is granted with respect to his ACPA counterclaim and Plaintiff's ACPA declaratory judgment claim. In addition, the court: 1) denies as moot Defendant's motion for summary judgment on his federal and state trademark infringement and federal and state unfair competition counterclaims because of the court's holding that Defendant is entitled to relief under the ACPA; and 2) dismisses as moot Plaintiff's claim seeking a declaration that the Domain Names do not infringe on Defendant's trademark. The court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith and, therefore, *in forma pauperis* status is denied for the purpose of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444–45 (1962).


SO ORDERED.

Dated: Brooklyn, New York
      February 28, 2013


                           _____/s/_____
                                DORA L. IRIZARRY
                         United States District Judge

App.57

# United States Court of Appeals
## FOR THE
### SECOND CIRCUIT

---

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 17th day of July, two thousand thirteen.

Present:

Robert A. Katzmann,
Peter W. Hall,
Raymond J. Lohier, Jr.,
*Circuit Judges.*

---

J. Taikwok Yung,

*Plaintiff-Counter-*
*Defendant-Appellant,*

v.                                                                13-1162

Donald J. Trump,

*Defendant-Counter-*
*Claimant-Appellee.*

---

Appellant, *pro se*, moves to stay proceedings in district court while this appeal is pending. Appellee, through counsel, opposes the motion and moves to stay the appeal pending the completion of proceedings in district court or, alternatively, to dismiss the appeal. Appellant opposes Appellee's motion to dismiss the appeal. Upon due consideration, it is hereby ORDERED that Appellee's motion to dismiss the appeal is GRANTED and the appeal is DISMISSED because this Court lacks jurisdiction over the appeal since a final order has not been issued by the district court as contemplated by 28 U.S.C. § 1291. *See Coopers & Lybrand v. Livesay*, 437 U.S. 463, 467 (1978). It is further ORDERED that Appellant's and Appellee's motions for stays are DENIED as moot.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk

SAO-AGC

App.58

Case 14-1554, Document 52, 07/20/2015, 1561696, Page117 of 129

App.59

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------- x
J. TAIKWOK YUNG d/b/a WEB-ADVISO,
                     *pro se,*

                   Plaintiff,

           -against-

DONALD J. TRUMP,

                Defendant.
------------------------------------------------------- x

          **SUMMARY ORDER ADOPTING**
          **REPORT AND RECOMMENDATION**
          11-CV-1413 (DLI)(VVP)

**DORA L. IRIZARRY, U.S. District Judge:**

On February 28, 2013, this Court granted summary judgment against the *pro se* plaintiff-counterclaim defendant J. Taiwok Yung d/b/a Web-Adviso ("Plaintiff"), concluding that Plaintiff had violated the Anti-Cybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d), through his ownership of four domain names that intentionally exploited the trademarked surname of defendant-counterclaim plaintiff Donald J. Trump ("Defendant"). (*See* Opinion & Order, Dkt. Entry No. 56.) Defendant then moved for statutory damages (*see* Defendant's Motion for Damages, Dkt. Entry No. 58), which this Court referred to the Honorable Viktor V. Pohorelsky, United States Magistrate Judge, for a Report and Recommendation ("R&R"). Amid briefing on that motion, Plaintiff moved for leave to file a sur-reply brief. (*See* Plaintiff's Motion for Leave, Dkt. Entry No. 73.)

On February 28, 2014, Magistrate Judge Pohorelsky issued a R&R, which recommended: (1) denying Plaintiff's request for leave to file a sur-reply brief; and (2) granting Defendant's Motion for Damages; (3) awarding Defendant $8,000 per infringing domain name, for a total judgment of $32,000; and (4) ordering Plaintiff to transfer his interest in the domain names trumpmumbai.com, trumpindia.com, trumpbeijing.com, and trumpabudhabi.com to the

App.59

App.60

Defendant. (*See* R&R, Dkt. Entry No. 75.) On February 11, 2014, Plaintiff filed timely objections to the R&R. (*See* Plaintiff's Objections ("Obj."), Dkt. Entry No. 77.) For the reasons set forth below, the R&R is adopted in its entirety.

## DISCUSSION

Where a party objects to an R & R, a district judge must make a *de novo* determination with respect to those portions of the R & R to which the party objects. *See* FED. R. CIV. P. 72(b); *United States v. Male Juvenile*, 121 F. 3d 34, 38 (2d Cir. 1997). If, however, a party makes conclusory or general objections, or attempts to relitigate the party's original arguments, the court will review the R & R for clear error. *Robinson v. Superintendent, Green Haven Correctional Facility*, 2012 WL 123263, at *1 (E.D.N.Y. Jan. 17, 2012) (quoting *Walker v. Vaughan*, 216 F. Supp. 2d 290, 292 (S.D.N.Y. 2002)). The district court may then "accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b); *see also* 28 U.S.C. § 636(b)(1).

Plaintiff's objections are nothing more than an attempt to relitigate the issues he briefed during summary judgment and are void of any arguments as to why the recommendations contained in the R&R should be rejected or modified. The Court has reviewed the R&R's well-reasoned and detailed analysis for clear error and has found none. Accordingly, the Court hereby adopts the R&R in its entirety.

## CONCLUSION

Upon due consideration, the R&R is adopted in its entirety. Accordingly, Plaintiff's motion for leave to file a sur-reply brief is denied. Defendant is awarded $8,000 per infringing domain name, for a total judgment of $32,000. Plaintiff is ordered to transfer his interest in the domain names trumpmumbai.com, trumpindia.com, trumpbeijing.com, and trumpabudhabi.com

2

App.61

to Defendant. The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith, and, therefore, *in forma pauperis* status is denied for purpose of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).


SO ORDERED.

Dated: Brooklyn, New York
      March 26, 2014

/s/
_____
DORA L. IRIZARRY
United States District Judge

3

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
J. TAIKWOK YUNG d/b/a WEB-ADVISO                    JUDGMENT
                                                   11-CV- 1413 (DLI)
                    Plaintiff,
                    Counterclaim Defendant

        -against-

DONALD J. TRUMP,

                    Defendant,
                    Counterclaim Plaintiff.
--------------------------------------------------------X

        An Order of Honorable Dora L. Irizarry, United States District Judge, having been

filed on March 26, 2017, adopting in its entirety the Report and Recommendation of Magistrate

Judge Viktor V. Pohorelsky, dated February 28, 2014; denying Plaintiff's motion for leave to file a

sur-reply; granting Defendant's motion for damages; awarding Defendant $8,000.00 per infringing

domain name for a total judgment of $32,000.00; ordering Plaintiff to transfer his interest in the

domain names trumpmumbai.com, trumpindia.com, trumpbeijing.com, and trumpabudhabi.com to

the Defendant within thirty (30) days of the date of the Court's Order; it is

        ORDERED and ADJUDGED that Defendant's motion for damages is granted; that

Defendant Donald J. Trump is awarded a total judgment of $32,000.00 against Plaintiff J. Taikwok

Yung d/b/a Web-Adviso; and that Plaintiff is ordered to transfer his interest in the domain names

trumpmumbai.com,

App.63

**JUDGMENT** 11-CV-1413 (DLI)

trumpindia.com, trumpbeijing.com, and trumpabudhabi.com to the Defendant within thirty (30)

days of the date of the Court's Order.

Dated: Brooklyn, New York
      March 27, 2014

Douglas C. Palmer
Clerk of Court

by:    */s/ Janet Hamilton*
       Deputy Clerk

2

App.64

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

J. Taikwok Yung (web-adviso),

          Plaintiff,
          Counterclaim Defendant

     - against -

Donald J. Trump,

          Defendant,
          Counterclaim Plaintiff

CV 11-1413 (DLI) (VVP)

**NOTICE OF APPEAL**



RECEIVED
APR 25 2014
PRO SE OFFICE

Notice of hereby given that Pro Se Plaintiff J. Taikwok Yung hereby appeals to the United States Court of Appeals for the Second Circuit from the decision entered on March 27, 2014 Docket Item #80.

Dated: Friday April 25th, 2014

J. Taikwok Yung

e: sporting202@yahoo.com
t: 646.309.8421

556 E88th St.
Brooklyn, NY 11236

App.64

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ x
J. TAIKWOK YUNG d/b/a WEB ADVISO, *pro se*,

                      Plaintiff,

                 -against-

DONALD J. TRUMP,

                    Defendant.
------------------------------------------------------------ x

**SUMMARY ORDER**
11-cv-1413 (DLI)(VVP)

**DORA L. IRIZARRY, United States District Judge:**

       On February 28, 2013, this Court granted summary judgment against the *pro se* plaintiff-counterclaim defendant J. Taiwok Yung d/b/a Web-Adviso ("Plaintiff"), concluding that Plaintiff had violated the Anti-Cybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d), through his ownership of four domain names that intentionally exploited the trademarked surname of defendant-counterclaim plaintiff Donald J. Trump ("Defendant"). (*See* Opinion & Order, Dkt. Entry No. 56.) Defendant then moved for statutory damages (*see* Defendant's Motion for Damages, Dkt. Entry No. 58), which this Court referred to the Honorable Viktor V. Pohorelsky, United States Magistrate Judge, for a Report and Recommendation ("R&R"). On February 28, 2014, Magistrate Judge Pohorelsky issued a R&R, which recommended: (1) denying Plaintiff's request for leave to file a sur-reply brief; and (2) granting Defendant's Motion for Damages; (3) awarding Defendant $8,000 per infringing domain name, for a total judgment of $32,000; and (4) ordering Plaintiff to transfer his interest in the domain names trumpmumbai.com, trumpindia.com, trumpbeijing.com, and trumpabudhabi.com to the Defendant. (*See* R&R, Dkt. Entry No. 75.) On March 26, 2014, the Court adopted the R&R (*see* Summary Order, Dkt. Entry No. 79), over Plaintiff's objections.

On April 25, 2014, Plaintiff filed the instant motion, which the Court construes as a motion for reconsideration of the Court's summary judgment decision, as well as the Court's adoption of the R&R. (*See* Plaintiff's Motion for Reconsideration ("Pl. Mot."), Dkt. Entry No. 84.) For the reasons set forth below, Plaintiff's motion for reconsideration is denied.

## DISCUSSION

This Order is written for the benefit of the parties and familiarity with the underlying facts and issues is presumed.[1] The Court construes Plaintiff's motion liberally, as is required for *pro se* submissions.[2]

"The standard for granting [a motion for reconsideration] is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transport, Inc.*, 70 F. 3d 255, 257 (2d Cir. 1995). "The major grounds justifying reconsideration are an intervening change in controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Hinds County, Miss. v. Wachovia Bank N.A.*, 708 F. Supp. 2d 348, 369 (S.D.N.Y. 2010) (citation and internal quotation marks omitted). Reconsideration is not a proper tool to repackage and relitigate arguments and issues already considered by the court in deciding the original motion. *Id.*; *United States v. Gross*, 2002 WL 32096592, at *4 (E.D.N.Y. Dec. 5, 2002). Nor is it proper to raise new arguments and issues. *Gross*, 2002 WL 32096592 at *4.

---

[1] A detailed discussion of the factual background of this case is set forth in this Court's February 28, 2013 summary judgment decision. (*See* Op. & Or., Dkt. Entry No. 56.)

[2] *Pro se* pleadings are held "to less stringent standards than formal pleadings drafted by lawyers." *Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (citation omitted). Courts should "interpret [such papers] to raise the strongest arguments that they suggest." *Forsyth v. Fed'n Emp't & Guidance Serv.*, 409 F.3d 565, 569 (2d Cir. 2005) (citation and internal quotation marks omitted). Though a court need not act as an advocate for *pro se* litigants, in such cases there is a "greater burden and a correlative greater responsibility upon the district court to insure that constitutional deprivations are redressed and that justice is done." *Davis v. Kelly*, 160 F. 3d 917, 922 (2d Cir. 1998) (citation omitted).

Plaintiff has made no showing of a change in the controlling law or the need to correct a clear error or to prevent manifest injustice. He has presented no new evidence or legal arguments in support of his motion; rather, he seeks to relitigate issues previously resolved by this Court. Accordingly, Plaintiff's motion for reconsideration is denied.

## CONCLUSION

For the reasons set forth above, Plaintiff's motion for reconsideration is denied. The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith, and, therefore, *in forma pauperis* status is denied for purpose of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

SO ORDERED.

Dated: Brooklyn, New York
      March 3, 2015

/s/
_____
DORA L. IRIZARRY
United States District Judge

3

# DISCLOSURE OF LAWYER ASSISTANCE

I, J. Taikwok Yung is stating that I had assistance in the drafting of this brief for case
14-1554 (Yung v. Trump)


J. Taikwok Yung

RECEIVED
2015 JUL 20 PM 7:40
U.S. COURT OF
SECOND CIRCUIT
NIGHT DEPOSIT

## CERTIFICATE OF COMPLIANCE

I, J. Taikwok Yung certify that this brief contains 14,000 words or less for case 14-1554 (Yung v. Trump).

J. Taikwok Yung

RECEIVED
2015 JUL 20 PM 7:39
U.S. COURT OF
SECOND CIRCUIT
NIGHT DEPOSITORY

United States Court of Appeals for the Second Circuit

Certificate of Service

Yung v. Trump (14-1554)

I, J. Taikwok Yung, hereby certify under penalty of perjury that on July 20, 2015, I served a copy of this brief by Email to Mathew Maron : mmaron@trumporg.com

His address is:
725 5th Ave,
NY, NY 10012

phone: 212-980-3821

J. Taikwok Yung

July 20, 2015

2015 JUL 20 PM 7:38
U.S. COURT OF
SECOND CIRCUIT
NIGHT DEPOSITORY
RECEIVED